JOHN SANDERSON & CO. (WOOL)
PTY. LTD., Plaintiff-Appellee,

v.

LUDLOW JUTE CO., LTD.,
Defendant-Appellant.

No. 77–1374.

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1977.

Decided Jan. 5, 1978.

Robert E. Sullivan, Boston, Mass., with whom James M. Hughes and Herrick & Smith, Boston, Mass., were on brief, for defendant-appellant.

Thomas E. Goode, Boston, Mass., with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal from a summary judgment for plaintiff-appellee entered in the District Court for the District of Massachusetts upholding an Australian court's default judgment for plaintiff in a contract action. Defendant-appellant alleges that the Australian judgment was obtained by fraud and that the district court should not have granted summary judgment because there were genuine issues of material facts. Defendant also claims that enforcement of the Australian judgment would violate United States treaty provisions and policy.

Plaintiff is an Australian company. Defendant is incorporated in Massachusetts, but its business is conducted in India. Plaintiff and defendant began doing business with each other in 1958. For the first three years, defendant shipped jute from India directly to Australian customers based on orders obtained by plaintiff. Plaintiff was paid a commission on each order. Because of the applicable Indian foreign exchange regulations, defendant had to obtain permission from the Reserve Bank of India before it made each commission payment.

In 1961, a new arrangement was entered into by which defendant shipped jute directly to plaintiff for resale. Plaintiff paid defendant for the jute within one hundred

twenty days of shipment whether or not it was resold during that period. This arrangement was predicated on the assumption that plaintiff would resell the jute at a higher price than it paid for it. Plaintiff was obligated to remit to defendant any profit in excess of its commission and expenses. All shipments were invoiced to plaintiff in Indian rupees with the approval of Indian custom officials.

Because of falling jute prices in Australia, plaintiff incurred a net loss of approximately $96,000 (Australian) on sales of approximately $700,000 from September 1, 1961, through January 1966. On June 1, 1966, plaintiff wrote to defendant claiming that it was obligated to be reimbursed for its losses. On June 23, 1966, a representative of defendant responded saying that he would review the claim to see whether it could legally reimburse plaintiff.

Defendant did not pay the claim, and, in October, 1967, plaintiff filed suit against it in the Supreme Court of Victoria, Australia. Defendant received notice of the suit in its Massachusetts office pursuant to an Australian long arm statute similar to the Massachusetts long arm statute, but did not appear to defend the claim.

Plaintiff obtained a default judgment in Australia in 1968. In 1971, it filed the present action to enforce the judgment.

Recognition of foreign judgments in the United States is predicated on the considerations found in *Hilton v. Guyot,* 159 U.S. 113, 205–206, 16 S.Ct. 139, 159, 40 L.Ed. 95 (1895).[1]

When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is *prima facie* evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

*Accord, Scola v. Boat Frances R., Inc.,* 546 F.2d 459 (C.A. 1 1976); *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624 (C.A. 2 1976); *Somportex Limited v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (C.A. 3 1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972); *Alleghany Corporation v. Kirby,* 218 F.Supp. 164 (S.D.N.Y.1963), *aff'd,* 333 F.2d 327 (C.A. 2 1964), *cert. granted,* 381 U.S. 933, 85 S.Ct. 1772, 14 L.Ed.2d 698 (1965), *cert. dismissed as improvidently granted,* 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335, *reh. denied,* 384 U.S. 967, 86 S.Ct. 1583, 16 L.Ed.2d 335 (1966). (*Alleghany* also distinguished between intrinsic and extrinsic fraud. Intrinsic fraud would not present an opportunity for collat-

---

**1.** The district court held that under *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), state law governs the effect to be given foreign judgments. The applicable standards are set forth in Mass.Gen.Laws, ch. 235 § 23A.

> Except as hereinafter provided, any foreign judgment that is final and conclusive and enforceable where rendered . . . shall be conclusive between the parties to the extent that it grants or denies recovery of a sum of money. . . .

Because of the similarity in standards, we do not rule on whether the *Erie* doctrine is to be applied when diversity jurisdiction is invoked for determination of a dispute between an alien and a citizen. *See Banco Nacional de Cuba v. Sabbatino Receiver et al.,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Aetna Life Insurance Co. v. Tremblay,* 223 U.S. 185, 32 S.Ct. 309, 56 L.Ed. 398 (1912); *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 301–304 (C.A. 3), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 629–630 (C.A. 2 1976); *Toronto-Dominion Bank v. Hall,* 367 F.Supp. 1009 (E.D.Ark.1973); *Svenska Handelsbanken v. Carlson,* 258 F.Supp. 448 (D.Mass.1966).

eral attack. The fraud alleged here is extrinsic.)

■ In *Hahn v. Sargent*, 523 F.2d 461, 464 (C.A. 1 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), we set out the applicable standards for reviewing a summary judgment.

In determining whether summary judgment is appropriate the court must "look at the record . . . in the light most favorable to . . . the party opposing the motion . . . ." Similarly the court must indulge all inferences favorable to the party opposing the motion. These rules must be applied with recognition of the fact that it is the function of summary judgment, in the time hallowed phrase, "to pierce formal allegations of facts in the pleadings . . .", and to determine whether further exploration of the facts is necessary. (Citations omitted.)

The district court found here:

[N]o evidence was proffered or alleged to exist which tended to show that anyone connected with Sanderson was aware that the contract violated the Indian regulations.

Ludlow claims that certain letters submitted in evidence, plaintiff's response to defendant's requests for admissions (F.R.C.P. Rule 36), and two newspaper articles raised a genuine issue as to the illegality of the contract and plaintiff's knowledge of it.

On August 28, 1961, before the first shipment of jute in question here, defendant sent a letter to Mr. Alfred Coombe, chairman of the plaintiff company, stating:

I should like to refer to my letter of April 17 in which we outlined a proposal for doing business in Australia, as I find now that due to regulations set up by the Indian government covering the export of goods from India it will be necessary for us to invoice any yarn, Jute-Bak, or Soil Saver, which we are putting into Australian stock, to you, with specific terms for payment. Therefore, this shipment of yarn for stock will be invoiced to you with payment due 120 days from date of shipment.

Plaintiff's response to defendant's request for admissions concerning this letter is as follows:

3(a). The plaintiff was already aware of the existence of the Indian Foreign Exchange Regulations. By reason of plaintiff's receipt of defendant's [August 28] letter the attention of the plaintiff was drawn to the possible applicability of such regulations to the transactions contemplated by the plaintiff and the defendant.

3(b). Plaintiff learned of defendant's statement that the transaction contemplated by the plaintiff and defendant had to conform to the said Foreign Exchange Regulations.

3(c). Plaintiff learned of defendant's statement that the said Foreign Exchange Regulation required specific terms of payment with respect to export shipments made by defendant from India.

3(d). Plaintiff learned of defendant's statement that the said Foreign Exchange Regulations prohibited shipments to plaintiff by defendant on consignment.

3(f). Plaintiff learned of defendant's statement that the said Foreign Exchange Regulations required that shipments by defendant from India could only be made with specific terms for payment by plaintiff, and that the said regulations prohibited shipments to plaintiff by defendant on consignment.

Defendant introduced two 1965 London newspaper articles dealing with the illegality of underinvoicing under Indian law. Discovery produced these items early in 1973 from one of plaintiff's files entitled "Calcutta Co. Pty. Limited, Letters to and From 1963/1965."

After plaintiff made a demand for a reimbursement of its losses, the defendant replied by the following letter:

As you know Alan, the agreement between our companies contemplated the adjustment of a surplus or deficit by the adjustment of our prices to you within the limits established by the foreign exchange laws of India . . . . Now

that the Indian rupee has been devalued, we will review the situation to determine whether we could legally reduce our price to permit you to begin the reduction of the deficit.

Defendant's whole case on the issue of fraud depends on the letters, the admissions, and the articles. The testimony of Frederick J. Chilton, a solicitor from New South Wales, to the effect that disclosure by plaintiff to the Australian court would be required if the Indian regulations rendered the contract illegal, and, if plaintiff knew this, is a statement of the law applicable, not any evidence that there was fraud. None of the documents even suggest that the Indian regulations made the contract illegal. On the contrary, until the last letter quoted, the letters suggest that efforts were being made to comply with the regulations.

The newspaper articles did not involve either of these parties and refer generally to "underinvoicing."

Nowhere in the admissions is there an acknowledgment by the plaintiff that it knew the contract was illegal or that underinvoicing was involved.

We agree with the district court that defendant offered no evidence from which it could be found that plaintiff knew that the contract violated Indian currency regulations, if indeed it did.

■ We deal briefly with defendant's second issue. It claims that the Bretton Woods Agreement renders the contract illegal because of the applicable Indian regulations.[2] Defendant's theory is that, because of the 1945 Bretton Woods Agreement, 60 Stat. 1401, Article VIII, Section 2(b), the Indian regulation must be enforced in this country.[3]

All three countries, India, Australia, and the United States, are signatories to the Agreement. The principles expressed in *Hilton v. Guyot* are more than sufficient to overcome what is at best a tenuous application of the Bretton Woods Agreement to a transaction which did not involve an exchange contract. *See Smithett and Cope, Ltd. v. Terruzzi*, 2 All E.R. 649, 658–659 (A.B.Div.1975), aff'd, 1 All E.R. 817 (Ct. of App. 1976). The Bretton Woods Agreement might possibly have been a legitimate defense before the Australian court and it could have been raised there since Australia is a signatory, but, because it was not, such defense is now foreclosed.

*Affirmed.*

---

**2.** "The amount representing the full export value of goods exported shall be received from the country of final destination of the goods, unless permitted otherwise by the Reserve bank in its discretion, and shall be paid to the exporter within six months from the date of shipment of the goods." [Indian] Foreign Exchange Regulation Act (Act VII of 1947) Rule 6.

**3.** "Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member. In addition, members may, by mutual accord, cooperate in measures for the purpose of making the exchange control regulations of either member more effective, provided that such measures and regulations are consistent with this Agreement."