Bruce A. HEATH and Sue A. Coppa, individually and as representatives and beneficiaries of the estates of Jack A. Heath and Thelma L. Heath, respectively, Plaintiffs,

v.

AMERICAN SAIL TRAINING ASSOCIATION; Henry H. Anderson, Jr., Christopher Withers, Tylor Field, II, Perry Lewis, and Jonathan T. Isham; Mark Shirley Portal Litchfield and Robin Patrick Cecil-Wright, individually and as co-owners of the S/V Marques, jointly and severally; and Mark Shirley Portal Litchfield and Robin Patrick Cecil-Wright d/b/a the China Clipper Society, Defendants.

C.A. No. 85–0329–S.

United States District Court, D. Rhode Island.

Sept. 25, 1986.

Lovett, Schefrin & Gallogly, Ltd., Aram Schefrin, Karen Davidson, Warren R. Wolf, Catherine A. Gibran, Providence, R.I., for plaintiffs.

Hanson, Curran & Parks, A. Lauriston Parks, James T. Murphy, Providence, R.I., and Arthur Murphy, Cecil-Wright, Newport, R.I., Vetter & White, Inc., George M. Vetter, Jr., Providence, R.I., Thornton, David & Murray, P.A., Carl W. Taylor, Miami, Fla., for defendants ASTA, Withers, Field, Lewis, Isham.

Gunning, LaFazia & Gnys, Inc., Richard T. Linn, Providence, R.I., for defendant Anderson.

## OPINION

SELYA, District Judge.

Invoking the admiralty and maritime jurisdiction of this court, these plaintiffs have brought suit against a flotilla of defendants. They take quite literally the century-old admonition that "admiralty may be styled, not improperly, the human providence which watches over the rights and interests of those 'who go down to the sea in ships'." *The Highland Light*, 12 Fed. Cas. 138, 139 (No. 6477) (C.C.Md.1867). And, they seek redress for what they view as a massive transgression of such rights and interests. Those whom they have elected to sue concur in the message of the *The Highland Light*, but dispute its applicability to any of their acts or omissions.

The court begins its voyage through these troubled waters with an overview of the case and a particularized description of the parties to the litigation. In subsequent sections of this opinion, the procedural posture of the suit and the relevant facts and applicable law will be discussed.

### I.

In an eighteen count amended complaint (complaint), the plaintiffs, brother and sister, place in issue liability for the tragic sinking of the Tall Ship S/V Marques on the high seas eighty miles northeast of Bermuda on June 3, 1984. At the time of the mishap, the vessel was engaged as a participant in a glamorous and much-heralded race of Tall Ships from Bermuda to Nova Scotia. Jack A. Heath and Thelma L. Heath, parents of the named plaintiffs, perished when the craft foundered. (A third surviving child of the decedents, a sibling of the named plaintiffs, has not joined the suit and is alluded to in only the vaguest of terms.)

The several defendants are linked by a common thread: they are all, in some way, connected to the Marques and to its final (fatal) passage. The defendant American Sail Training Association (ASTA) is a nonprofit organization founded in 1971 and based in Newport, Rhode Island. ASTA has a total membership of approximately three hundred souls; some two dozen of them serve on its board of directors. ASTA's day-to-day operations are the responsibility of its executive director, a post held at all times material hereto by George Crowninshield. The board carries out general policy oversight. Crowninshield (a retired United States Navy captain) and a pair of clerical workers are the organization's only paid employees. Much of the group's work is funneled through an armada of volunteers.

ASTA relates in various ways to ships under sail. A principal ASTA activity is the sponsorship of racing events and competitions. A second regularly-conducted ASTA function is the placement of individuals on deepwater sailing ships for what is called "sail training." Interested persons apply, pay a fee, and are placed aboard ship for a finite period, usually coincident with the duration of a particular race. While on board, these acolytes are expected to assist in the ship's work. Placement in the program is aimed at acquainting recruits with how such a craft operates and with the disciplines and techniques involved. Sail training is a learning experience afloat: would-be sailors further their nautical education by observing and by doing. The regimen is not designed to be a frolic or diversion for the idle rich; the cruise assignments are not thinly-disguised vacation

voyages. Rather, the program is regarded as a serious, thoughtful effort to provide participants with a unique type of hands-on sailing experience.

The defendants Anderson, Withers, Field, Lewis, and Isham are each and all officers and directors of ASTA. At the time of the sinking, Anderson served as ASTA's chairman, Withers and Field as the group's two vice-chairs, Lewis as secretary, and Isham as treasurer. None are remunerated in any tangible way for their involvement with the organization. For ease in reference, ASTA and the quintet of officer/directors who have been sued in this case are sometimes collectively referred to as "the ASTA defendants."

The remaining two defendants, Mark Shirley Portal Litchfield and Robin Patrick Cecil-Wright, are the co-owners of the Marques, and are the sole principals in an unincorporated holding company, the China Clipper Society (CCS), which holds title to the Marques. They are sued jointly and severally in an amalgam of capacities: individually, as owners of the vessel, and as the general partners and/or coventurers in CCS.

### II.

As mentioned initially, the complaint contains some eighteen distinct statements of claim. Close perscrutation indicates that the task of parsing the complaint is not as formidable as the sheer number of counts would suggest. The plaintiffs' asseverations can be grouped quadrantally.

1. The named plaintiffs are domiciled in Ohio; it is their contention that, to the extent state law is applicable, Ohio law will govern. Thus, the first ten counts of the complaint assert a variety of claims for wrongful death and damages prescinding therefrom arising under Ohio law. *See* Ohio Rev.Code Ann. § 2125.01 *et seq.*[1] Count XVIII is a variation on this theme, urging that damages for wrongful death be assessed "under the laws of the United Kingdom, and in particular, Lord Campbell's Act of 1846."

2. Counts XI, XII, and XIII all are framed as breach of contract claims. The first two of these merely restate the wrongful death claims, recasting them as supposed breaches of various promises and warrantees anent safe passage, seaworthiness, and the like. Count XIII seeks the refund of sail training fees allegedly paid by the plaintiffs' decedents. Whereas the other statements of claim run against all of the named defendants, jointly and severally, this contract-based triumvirate of counts is directed only against ASTA.

3. Counts XIV and XV assert entitlement to damages under the federal Death on the High Seas Act (DOHSA). 46 U.S.C. § 761 *et seq.*

4. Counts XVI and XVII likewise sound in federal statutory law, namely, the Jones Act. 46 U.S.C. § 688, alleging in pertinent part that the plaintiffs' decedents were "seamen" and part of the crew of the Marques when calamity struck.

The case is now pending before the court on a motion for summary judgment and an accompanying motion to strike.[2] The summary judgment initiative seeks, on behalf of the ASTA defendants, to deep-six the suit with respect to all but two of the plaintiffs' causes of action. (That motion

---

**1.** Count X of the complaint is a rather peculiar hybrid of Ohio law and British law. Inasmuch as all the parties have grouped it with Counts I through IX for purposes of argument, the court categorizes it similarly. The court observes, however, that if Count X was to be treated as a foreign law wrongful death claim, it would add nothing to the claim independently limned in Count XVIII.

**2.** Another motion for summary judgment (the "junior motion") was filed on behalf of all of the ASTA defendants except ASTA itself, that is, the individually named officer/directors of ASTA. Resolution of the questions raised by the instant motion, *see* text *post,* reduces the scope and gravamen of the junior motion to a point where only pedestrian issues remain. Rather than to clutter the text of this opinion with any substantive discussion of the junior motion, the court simply acknowledges its pendency and indicates an intention to dispose of it by the issuance of a summary order soon after the filing of this opinion.

holds Counts XIV and XV harmless.) And, noting that DOHSA mandates a trial by the court without the intervention of a jury, *see* 46 U.S.C. § 761 (DOHSA claims maintainable only "in admiralty"), the ASTA defendants have filed a concomitant motion under Fed.R.Civ.P. 12(f) to strike the plaintiffs' jury demand.

The instant motions date back to December 4, 1985. Following the request of the plaintiffs for additional time to respond thereto, *cf.* Fed.R.Civ.P. 56(f), the court allowed all parties until April 29, 1986 to supplement the record. The parties were also permitted to file augmented briefs. The motions were discussed with the court by all counsel at considerable length in a series of conferences held both before and after the Supreme Court's decision of *Offshore Logistics, Inc. v. Tallentire,* — U.S. ——, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (analyzed in greater detail in Part V hereof, *post*). At a hearing held on September 5, 1986, all parties waived further oral argument.

### III.

Because the pending motions are so peculiarly dependent on the specific facts of this case, the court is compelled to chronicle the sinking of the Marques and the ensuing deaths of Mr. and Mrs. Heath in some detail. Mindful of the summary judgment standard, *see* Part IV *post*, the court has scoured the nisi prius roll and the filings of the parties to piece together the tale from essentially undisputed facts of record, drawing all reasonable inferences therefrom in the light most favorable to the plaintiffs.

ASTA obtains nautical trainees in myriad ways. Perhaps the most recurrent pattern involves prospective recruits who learn of the program through advertisements in sailing magazines or by means of fliers which are mailed to various colleges and universities. Jack and Thelma Heath were avid travelers and sailors. They learned of ASTA and its sailing programs in such a fashion, spying a notice in the sailing magazine *Cruising World.* They responded, requesting further particulars.

The next series of steps in the enrollment pavane were also rather standard. Generally, persons who expressed interest in any ASTA program were furnished an application form, to be completed and returned with a small enrollment deposit. The application required, among other things, a health history and a certification of swimming proficiency. Jack and Thelma received and completed application forms. Both were in their mid-fifties and in generally good health. At all times material hereto, they were Canadian domiciliaries. Jack listed his vocation as the presidency of the Canadian division of Norton, Inc. Thelma indicated that she was principally a housewife. Apparently in the belief that a stint aboard a Tall Ship as ASTA trainees would be an enjoyable and worthwhile segment of a planned respite from their customary work, the Heaths applied to ASTA for positions on the Marques in the upcoming Bermuda to Nova Scotia race.

In compling their applications, the Heaths made special note of their considerable sailing experience, which included the successful completion of a United States Coast Guard Auxilary Sailing/Seamanship Course, and sailing voyages in which Mr. and Mrs. Heath had crewed aboard yachts in the Atlantic, Pacific, and Mediterranian Oceans. Ultimately, Jack and Thelma received exactly the placements which they sought: ASTA accepted their applications, assigned them to the Marques for the Bermuda/Nova Scotia race, and accepted further fees from them.[3]

In order to establish a proper perspective on the situation and on the interrelationships which eventuated, it is helpful at this juncture to scrutinize the dealings between

---

**3.** It is undisputed that, between the initial application fee and the deposit on acceptance into the sail training program, Jack and Thelma each paid a total of $700 to ASTA. There is nothing in the record to support the allegation (Complaint ¶ 14) that each remitted twice that amount. Accordingly, the refund demand for $2800 contained in Count XIII can most charitably be viewed as improperly doubled.

ASTA and the ships which participated in its sail training program. The experience of the Marques in this regard was not out of the ordinary. As a condition precedent to an association with the ASTA program, the owners of the Marques had to offer assurances that certain ASTA requirements would be fulfilled. In this wise, the letter agreement entered into between the owners and ASTA is particularly instructive. As part of that contract, ASTA promised to use its best efforts to recruit trainees for the ship. It agreed to forward to the owners the bulk of the monies collected from each trainee, retaining only certain reimbursements and a small ($50) per capita fee. For their part, the shipowners agreed to abide by numerous requirements which ASTA imposed. These included comprehensive ASTA maintenance and sailing instructions, the presence aboard ship of an (unpaid) ASTA counselor or counselors to work with the trainees for the length of the voyage, the provision of liability insurance in stipulated minimum limits, and the like. In short, CCS accepted the conditions precedent to participation in the ASTA program. And, relying in part upon that acceptance, ASTA assigned Jack and Thelma Heath to the craft for the planned voyage.

The Heaths boarded ship on Friday, June 1, 1984. They found that the Marques was a 117 foot, three masted, wooden barque which had originally been built in Valencia, Spain. Over the years the vessel had been refitted and redesigned on a number of occasions. At the time the Heaths were piped aboard, she was to all appearances shipshape and Bristol fashion. She was then of British flag and registry, operating pursuant to certification issued by the British Department of Transport.

On the evening of June 1 (the night before the race began), the crew attended an all-hands meeting onboard ship. There were also six ASTA trainees and two assigned (ASTA) counselors in attendance. The meeting was conducted by Stuart Finlay, the captain of the Marques. It lasted approximately one hour and covered a bouillabaisse of topics, such as the chain of command, the duties of trainees, ship func-

tions, and safety matters. On the next morning, the trainees met at their respective watch stations and were given a further briefing as to the ship's routines.

There is no question but that the ASTA trainees, despite their payment of fees to ASTA (and indirectly, to the shipowners), were expected to sing for their supper. They were subject to all orders of the captain, assigned to the round-the-clock watch schedule in the same frequency and rotation as the crew, and listed on the Marques's "race list" as supplemental crew. They assisted in the ship's work in a variety of ways, *e.g.*, handling the ropes and lines, furling the sails, helping out in the galley and belowdecks, performing routine shipboard chores. There is some evidence that Jack Heath had an active hand in sailing the vessel for a three hour stretch shortly before she sank. *See* Deposition of John Ash at 55 (March 27, 1986). Moreover, the plaintiffs contend that CCS, the vessel's owner, had issued a bulletin, *see* Exhibit M annexed to plaintiffs' supplemental memorandum, stating that trainees were to be "considered as part of the permanent crew and ... divided into duty watches." Even when off watch, trainees "are liable to be called to help handle the vessel." *Id.* CCS expected trainees "to help with all aspects of running the ship, which includes domestic chores." *Id.* There is every reason to believe that Jack and Thelma Heath approached their tour aboard the Marques with these strictures in mind.

Ten ships, including the Marques, began the race during the afternoon of June 2. The weather was glorious. The day was well-suited to sailing: bright and clear, with a crisp fifteen knot wind out of the west-southwest and three to four foot seas. The Marques crossed the starting line under full sail at approximately 4:00 p.m. At midnight, the weather remained clear, the wind was steady at fifteen to twenty knots, and the ship remained velivolant. The seas were running at approximately ten feet. The Marques was moving at roughly five knots and her speed was increasing.

Toward 4:00 a.m.; the Marques reached her rendezvous with destiny. The weather changed. The wind picked up, and a steady downpour began. Suddenly, the rain became fierce (close to torrential), and the wind intensified. The Marques was caught in a deadly squall. Without warning, the ship slowed and slammed over on her starboard side. In doing so, she took on great amounts of water. As she filled, she started to settle back upright and was blown back down again. According to one survivor, she then plunged bow first "like a saucer in dishwater," righting herself as she went under. It is estimated that it took no more than thirty to forty-five seconds for the Marques to sink. The Heaths were caught below deck and went down with the ship. (Of the twenty-eight persons aboard the Marques on the night she sank, nineteen were lost.)

### IV.

The yardstick by which the instant Rule 56 motion must be measured has been sufficiently well defined in the caselaw that exegetic treatment is not required. It suffices to say that summary judgment with respect to a particular claim or defense can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). In determining whether these conditions have been fulfilled, the court must view the record in the light most flattering to the parties opposing the motion, *Emery,* 701 F.2d at 986; *John Sanderson & Co (WOOL) Pty. Ltd. v. Ludlow Jute Co.,* 569 F.2d 696, 698 (1st Cir.1978), indulging all reasonable inferences favorable to those parties or hospitable to the denial of the motion. *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir. 1982); *O'Neill v. Dell Publishing Co.,* 630 F.2d 685, 686 (1st Cir.1980). The court is not at liberty to weigh competing evidence or to make credibility choices. The burden rests with the movant—and it is a considerable one.

### V.

Although the instant motion for summary judgment raises a plethora of points, the issues are susceptible to efficient consideration in much the following sequence. First, the court must unravel the extent to which DOHSA, 46 U.S.C. § 761 *et seq.,* preempts the field. To this end, the court will consider, seriatim, the effect which DOHSA has on (i) the state law wrongful death claims, (ii) the contract claims, (iii) the Jones Act claims, and (iv) the foreign law wrongful death claim. Then, to the extent (if at all) that any such claims survive, the court will examine the sufficiency of the record to withstand summary judgment thereon. And in the afterglow of these rulings, the court will treat with the motion to strike the jury demand.

### A. THE SWEEP OF DOHSA

For many years, under the doctrine of *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), general federal maritime law did not afford an effective right of action for wrongful death occurring on the high seas. For all practical purposes, from the time of *The Harrisburg* until the passage of DOHSA in 1920, "there was no remedy for death on the high seas caused by breach of one of the duties imposed by federal maritime law." *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 393, 90 S.Ct. 1772, 1784, 26 L.Ed.2d 339 (1970). And state laws were of little help: "The general understanding was that the statutes of the coastal States, which provided remedies for deaths within territorial waters, did not apply beyond state boundaries." *Id.* at 393 n. 10, 90 S.Ct. at 1784 n. 10. DOHSA was enacted in 1920 to fill this void; it provided—and continues to provide—a federal maritime remedy for wrongful deaths occurring beyond the territorial waters of the states, that is, more than three miles from shore.

All of the parties to this litigation agree that the deaths of Jack and Thelma Heath, given the attendant circumstances, fall squarely within the ambit of DOHSA. Indeed, the uncontroverted facts admit of no other rational conclusion. The parties disagree, however, as to the exclusivity vel non of the DOHSA remedy and as to the extent that DOHSA forecloses the plaintiffs from recourse to other channels of remediation. These disagreements must be assessed piecemeal, that is, the effect of DOHSA must be assayed vis-a-vis each specie of claim which the plaintiffs labor to present.

### 1. *Preemption: State Wrongful Death Claims.*

■ While these motions were pending, the Supreme Court resolved a conflict in the circuits and decided that, where DOHSA applied, there was no room for the operation of state wrongful death laws. *See Offshore Logistics, Inc. v. Tallentire,* —— U.S. ——, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). In *Tallentire,* the Court held flatly that, in the reflected light of DOHSA's legislative history and the congressional purposes underlying the Act, the language of § 7 of DOHSA, 46 U.S.C. § 767,[4] should be read narrowly as a jurisdictional savings clause. So viewed, DOHSA ensures that state courts have the right to entertain causes of action and thereby to provide wrongful death remedies both for accidents occurring on state territorial waters (under applicable state law) and for accidents occurring on the high seas (under DOHSA). *Id.* 106 S.Ct. at 2498–99. Nevertheless, the Court concluded that these remedies could not be mixed and matched;

**4.** Section 7 of DOHSA, 46 U.S.C. § 767, reads as follows:

The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone.

**5.** The Supreme Court noted in *Tallentire,* 106 S.Ct. at 2491 n. 1, that DOHSA includes no provision authorizing recovery for pain and suf-

all state wrongful death statutes are preempted by DOHSA, wherever DOHSA applies. *Id.* at 2500.[5]

In the wake of *Tallentire,* there can be no doubt that the applicability of DOHSA precludes these plaintiffs from maintaining the wrongful death claims asserted under Ohio law. Thus, as to Counts I through X, inclusive, of the complaint, the movants must prevail as a matter of law. But, questions as to the viability of other counts of the complaint survive—or at least arguably survive—*Tallentire.*

### 2. *Preemption: Certain Contract Claims.*

As noted previously, there are a trio of claims which sound in contract. The last of these, Count XIII, seeks the rebate of the fees paid to ASTA. It is of a wholly different genre from the two immediately preceding counts and is not endangered by DOHSA preemption. Counts XI and XII of the complaint, however, are not so sheltered. Although cast in a contract mold, they are mere restatements of the wrongful death claims. They incorporate verbatim by reference the factual averments set out in Count I (the flagship state law wrongful death claim). They also incorporate, by the same reference, the allegation that they are prosecuted, commenced and maintained "pursuant to Ohio Revised Code Section 2125.01 *et seq.,*" the Ohio wrongful death act. The fresh allegations of Counts XI and XII are largely conclusionary. They add nothing which would serve, factually or legally, to exhume these counts from the state law ashes which trail aft of *Tallentire.*

fering before death. The Court did not address the issue of whether remediation under DOHSA may be supplemented by some conceivable state statute which both (i) authorizes a damage award for the decedent's pain and suffering and (ii) is intended to apply to fatalities in international waters. This court need not cross that bridge at present; the plaintiffs have not argued or suggested that the Ohio statutes, Ohio Revised Code § 2125.01 *et seq.,* meet the close tolerances of these narrow specifications.

This conclusion is evident not only from the fact that the two aforementioned "contract" claims rest on exactly and precisely the same factual averments as the state law wrongful death claims, but from the allegations of the damage presumably caused, viz.:

Count XI: "The death of plaintiffs' decedents consequently flowed from defendants' [sic] breach of contract."

Count XII: "The deaths of plaintiffs' decedents consequently flowed from defendant's [ASTA's] breach of warranties."

A wrongful death claim cast as a contract claim is still a wrongful death claim. The court is compelled to read a stated claim for what it is, not what it purports to be. *See, e.g., Fricker v. Town of Foster,* 596 F.Supp. 1353, 1358 (D.R.I.1984) (it makes no difference that plaintiff casts some of his allegations in a contract mold if they are, in fact, claims for injuries to the person); *Griffin v. Woodhead,* 30 R.I. 204, 206, 74 A. 417 (1909) (a tort claim is a tort claim, though labeled by the pleader as sounding in contract). Shorn of the (misleading) contractual characterizations in which they have been cloaked, Counts XI and XII must be read as claims for wrongful death.

Judicial treatment of labor disputes propped in the pose of state law litigation provides a useful analogy. Courts routinely pierce the veil of pleadings to discern their underlying character when ruling on questions of federal preemption. In *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 292, 91 S.Ct. 1909, 1920, 29 L.Ed.2d 473 (1970), the Supreme Court declared that "[p]re-emption ... is designed to shield the system from conflicting regulation of conduct. It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."

Citing *Lockridge,* the district court in *Campbell v. McLean Trucking Co.,* 592 F.Supp. 1560 (E.D.N.Y.1984) construed a state law claim for tortious interference with prospective employment opportunities as equivalent to an assertion of blacklisting (an unfair labor practice) and thus preempted by the National Labor Relations Act. Stripping the plaintiff's cause of action of its state law vestments, the court observed that "[a] mere labeling of the conduct complained of ... does not satisfy the requirements necessary to avoid preemption.... [I]t is the conduct and not the legal description which is important." 592 F.Supp. at 1564.

To like effect is *State of N.Y. v. Loc. 144, Hotel, Nurs. Home, etc.,* 410 F.Supp. 225 (S.D.N.Y.1976), where the characterization balance was similarly struck in favor of substance as opposed to form. As in *Campbell,* the court peeked behind the plaintiffs' pleadings to find their claims preempted by federal law: "[W]here Congress has explicitly said that the exclusive source of a plaintiff's right to relief is to be a federal law, it would be unacceptable to permit that very plaintiff, by the artful manipulation of the terms of a complaint, to defeat a clearly enunciated congressional objective." *Id.* at 227 (quoting *Hearst Corp. v. Shopping Center Network,* 307 F.Supp. 551, 556 (S.D.N.Y.1969)).

It is equally clear that the purposes of DOHSA require that there be a uniform method for disposing of claims anent death on the high seas—and that the provisions of DOHSA itself comprise this homogeneous method. *See Tallentire,* 106 S.Ct. at 2491; *Moragne v. States Marine Lines, Inc.,* 393 U.S. at 398–401, 90 S.Ct. at 1786–88. Thus, simply calling a wrongful death claim a contract claim, as plaintiffs have attempted to do with Counts XI and XII, cannot effect an end run around DOHSA and stiffarm the manifest intent of the Congress in the bargain.

Moreover, even if these contract claims had some standing as such, their subject matter is inherently "of the sea;" accordingly, they would be governed by general maritime law. "[A]dmiralty contract jurisdiction 'extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the

navigation, business or commerce of the sea.'" *Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 215 n. 7, 90 S.Ct. 347, 350 n. 7, 24 L.Ed.2d 371 (1969), quoting *DeLovio v. Boit,* 7 F.Cas. 418, 444 (No. 3776) (C.C.D.Mass.1815) (Story, J.); *Kossick v. United Fruit Co.,* 365 U.S. 731, 735–36, 81 S.Ct. 886, 889–90, 6 L.Ed.2d 56 (1961); *Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 470 (1st Cir. 1985). It is perfectly plain that, to the extent that these counts state contract claims at all, they fall squarely within admiralty jurisdiction. The fact that they have been artfully cast in a contract mode does not vitiate the traditional maritime nature of the transactions involved or of the underlying wrongs which the counts allege. And, under federal maritime law it is clear that—apart from whatever succor DOHSA supplies—no provision is made for damages for wrongful death. *See The Harrisburg,* 119 U.S. at 213–14, 7 S.Ct. at 146–47. *See also* H.R.Rep. No. 674, 66th Cong., 2d Sess., 2, 4 (1920) (accompanying DOHSA) ("there is no right of action for death" under maritime law).

Based upon the foregoing analysis, this court holds that Counts XI and XII are preempted by DOHSA and must be dismissed. Count XIII, however, is a sea horse of a different color. It may stand.

### 3. *Preemption: Jones Act.*

■ The statements of claim brought in pursuance of the Jones Act, 46 U.S.C. § 688 (Counts XVI and XVII of the complaint) are plainly outside of the prescriptive reach of DOHSA. The two remedies may be pleaded in the alternative. *Moragne v. States Marine Lines, Inc.,* 398 U.S. at 396 n. 12, 90 S.Ct. at 1785 n. 12; *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 270 n. 10 (5th Cir.1974); *Doyle v. Albatross Tanker Corp.,* 367 F.2d 465, 466–67 (2d Cir.1966); *The Four Sisters,* 75 F.Supp. 399, 400 (D.Mass.1947). *Tallentire* does not presume to alter this well settled rule. Any argument in favor of DOHSA occupation of the Jones Act field is meritless.

### 4. *Preemption: Foreign Law Claim.*

■ As mentioned earlier, Count XVIII of the complaint purports to assert wrongful death claims under the laws of the United Kingdom. Whatever other infirmities this initiative may possess, it cannot be said to fall victim to the territorial sweep of DOHSA. To the contrary, § 4 of DOHSA specifically accommodates and preserves intact rights of action rooted in foreign law:

> Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect or default occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding.

46 U.S.C. § 764.

Thus, if and to the extent that foreign law grants to these plaintiffs any rights of action in respect to the deaths of their parents—a query which need not be addressed at this juncture—DOHSA does not preempt the field.

### B. SUFFICIENCY OF SURVIVING CLAIMS

Once the preemptive force of DOHSA has been fully credited, the DOHSA claims tentatively pend in parallel with the refund claim (Count XIII), the Jones Act forays (Counts XVI and XVII), and the foreign law claim (Count XVIII). DOHSA, for the reasons stated, overshadows and precludes the maintenance and prosecution of each and all of the plaintiffs' other initiatives. It remains for the court to consider whether, under the Rule 56 standard, *see ante* Part IV, the record presents genuine issues of material fact adequate to allow any one or more of the counts which escape DOHSA preemption to go forward to trial. Inasmuch as the parties have treated the Jones Act claims as comprising the eye of the storm in this analysis, the court begins by surveying that cloud cover.

### 1. *Sufficiency of Jones Act claims.*

■ The parties agree that an essential element in the plaintiffs' ability to prosecute Jones Act claims is a showing that the decedents were in the defendants' employ within the meaning of the law. As the statute itself intones, "[a]ny seaman who shall suffer personal injury *in the course of employment* may ... maintain an action for damages at law ...," 46 U.S.C. § 688 (emphasis supplied). There are three elements to the statutory calculus: there must be (i) a personal injury, (ii) to a seaman, (iii) arising in the course of his employment. If these hurdles are overcome, a suit under the Jones Act lies in favor of the seaman/plaintiff (or his personal representative, if death has ensued) against the employer. *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790–91, 69 S.Ct. 1317, 1321–22, 93 L.Ed. 1692 (1949). Absent any one or more of these three ingredients, the claim winds up in the scuppers.

In the case at bar, the plaintiffs' decedents suffered the ultimate personal injuries, so the first of the three factors is not legitimately in dispute. It is settled that the "injury" language of the statute extends to and encompasses claims for wrongful death: "in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages [for wrongful death]." 46 U.S.C. § 688. The court assumes arguendo that Mr. and Mrs. Heath could be classified as seamen for Jones Act purposes; after all, despite the fact that they were unpaid (indeed, themselves paying) passengers, there is some evidence that they performed the ship's work—and the test of whether or not one is viewed as a "seaman" vis-a-vis the vessel is essentially a functional one. *See, e.g., Norton v. Warner Co.*, 321 U.S. 565, 572, 64 S.Ct. 747, 751, 88 L.Ed. 931 (1944); *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 260, 60 S.Ct. 544, 549, 84 L.Ed. 732 (1940); *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157 (1926). The claim inexorably founders, however, on the final downwind leg—for it is plain beyond the shadow of a doubt that ASTA and the Heaths did not share the requisite employment relationship.

■ That an employer-employee relationship is essential to recovery under the Jones Act cannot be gainsaid. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. at 394, 90 S.Ct. at 1784; *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. at 791, 69 S.Ct. at 1321–22; *Turner v. Wilson Line of Massachusetts*, 242 F.2d 414, 417 (1st Cir.1957); *Nolan v. General Seafoods Corporation*, 112 F.2d 515, 517 (1st Cir.1940). *See also* Gilmore and Black, *The Law of Admiralty* § 6–21 (1957). The existence vel non of the relationship in a given set of circumstances is a factual question to be resolved by application of common law standards to the exact crosscurrents which characterize any particular situation. *Solet v. M/V Captain H.V. Dufresne*, 303 F.Supp. 980, 982 n. 1 (E.D.La. 1969). Here, the facts permit only a single conclusion: that no employment relationship arose between these parties.

In contesting the existence of an employment relationship, the ASTA defendants find it to be determinative that the decedents were not compensated in coin of the realm for their "work" aboard the Marques. But, this is too parochial a view. Wage payment is not a sine qua non for qualification as an employee under the common law. Rather, four elements must be considered in making a status determination of this sort: (i) the selection and engagement of the putative employee, (ii) the situation vis-a-vis payment of wages, (iii) the situs of the power of dismissal, and (iv) the situs of control over on-the-job conduct. 53 Am.Jur.2d, *Master and Servant* § 2 (1970). Of this quartet of factors, payment of wages is the least important. Consideration is not essential to create the relation of master and servant. Restatement (Second) of Agency § 225, Comment (a) (1958). The key element, rather, is the right of control (including the right to direct the manner in which the work shall be done). *Stone v. Pinkerton Farms, Inc.*,

741 F.2d 941, 943 (7th Cir.1984); *Afonso v. City of Boston,* 587 F.Supp. 1342, 1347 (D.Mass.1984).

These same principles inform the concept of "employment" under the Jones Act. Although an unpaid temporary crew person may indeed qualify as an employee for Jones Act purposes, the instant plaintiffs cannot credibly shoehorn their decedents into such a status. *In re Read's Petition,* 224 F.Supp. 241 (S.D.Fla.1963) is the plaintiffs' heaviest gun in support of finding an employment relationship to have existed. Yet, *Read* misfires in the present context.

The *Read* court held that an unpaid volunteer temporarily aboard a sailing yacht for the duration of a race was an employee within the contemplation of the Jones Act. *Id.* at 245–47. In *Read,* however, the plaintiff had explicitly agreed to perform the duties of a full crew member and to be subject to the control of the defendant-shipowners.[6] The case at bar, however, distinguishes itself in at least one critical respect. In this case, the plaintiffs' decedents were in no way subject to the control of ASTA while on board the vessel; rather, they were subject to the control of Captain Finlay who, in turn, was the managing agent of the owners of the Marques. This is the fatal flaw of the plaintiffs' argument: they fail to make any credible case as to ASTA's control over the Heaths during the brief and tragic voyage.

The plaintiffs are hard pressed to mount any semblance of a viable argument that their decedents were juxtaposed in an employer-employee relationship with ASTA. Though it is undisputed that ASTA selected the trainees to be placed aboard the various Tall Ships in the first instance, it strains credulity to say that those individuals were in any sense engaged for work purposes *on ASTA's behalf.* ASTA paid no wages to the Heaths; to the contrary, the latter paid for the privilege of participation in the race as trainees aboard the Marques. ASTA itself derived no tangible benefit from whatever labors the Heaths undertook to perform. Nor can it be said that ASTA possessed a meaningful power of dismissal over the trainees once the cruise began, or that the organization retained the right to "control" them in any meaningful way during the voyage. As was true of all hands aboard the vessel, the ASTA trainees were absolutely subject to the jurisdiction and governance of the shipowner, acting through the master of the Marques, Captain Finlay. There is nothing to indicate either that the master's authority was subordinate in any way to the ASTA counselors or that ASTA in any way superimposed itself on the captain's allegiance to CCS.

To be sure, the trainees, harking back to their volunteer status, were accorded considerable leeway in selecting which aspects of the ship's operations they preferred to learn. Some found certain tasks more appealing and were permitted to concentrate their efforts on such chores. ASTA, through its counselors, may have assisted in smoothing the way for such accommodations. Yet, there is not a scintilla of proof that any trainee was ever allowed to do (or to reject) any work against the captain's wishes, or that the essential control of the

6. The plaintiffs' decedents in the case at bar were far removed from the classic "workaway" situation. A workaway is commonly regarded as an individual who signs articles and works onboard a vessel in return for free passage. By subscribing to the ship's articles, being engaged on a vessel in navigation, and doing work of a maritime nature, he comes to be regarded as a seaman for certain purposes. As a result, when injured by reason of the shipowner's negligence or the unseaworthiness of the vessel, he has a Jones Act remedy. *See United States v. Firth,* 207 F.2d 665, 666 (9th Cir.1953); *The Tashmoo,* 48 F.2d 366, 368 (E.D.N.Y.1930). Jack and Thelma Heath were not workaways in that they did not execute the ship's articles and did not trade sweat for free passage. Rather, they paid for the privilege of learning the ropes aboard the Marques.

Even if the plaintiffs' decedents could be classed as workaways, the Jones Act analysis would not be affected. Their status as workaways might fix the plaintiffs' sights more firmly upon CCS vis-a-vis any statutory liability on the latter's part, but that status would not assist in remedying the critical defect in the Jones Act claims against the ASTA defendants. No matter how the compass is spun, the needle swings back to point squarely to ASTA's total lack of control during the voyage.

vessel (and all those aboard her) was ever diverted from the captain. Such details further belie the assertion of plaintiffs that an employment relationship existed between their decedents and ASTA.

ASTA's people were on board the Marques by the grace of the shipowner and at the sufferance of the ship's officers. They neither usurped nor diluted the captain's powers in any way. They were subject to his direction and control in every significant respect. Indeed, there was a written statement of the philosophy which was to govern the working relationship between the ship's master and the ASTA counselors. That statement, in the form of a letter from Thomas R. Weschler (a member of ASTA's "sail training and education committee")[7] to the ship's captain was attached to the letter agreement between ASTA and CCS, and incorporated by reference therein. It provided explicitly that ASTA "look[ed] to the Captain and the crew to run the ship ... [and] to the counselor/instructor to work with the Captain to optimize the benefits of the cruise to the trainees, to answer any general questions on working relationships, and to handle off-watch training [for the ASTA recruits] *other than ship's work." See* Exhibit E–3 to Motion for Summary Judgment at 1 (emphasis supplied). The Weschler letter concluded with the reminder that ASTA "look[s] forward to our trainees being in your hands...." *Id.* at 3.

The letter agreement between ASTA and CCS further reflected the former's concurrence in the shipowner's written requirements applicable to trainees, *see* Exhibit E–4 to Motion for Summary Judgment, and obligated ASTA to "provide copy [sic] to all trainees." Those requirements, and the

ship's regulations, Exhibit E–5 (which the requirements insisted that each trainee must read), left not a shred of doubt but that the ASTA recruits were subject to the hegemony of the captain and the ship's officers in all material matters. For practical purposes, if there was an "employer" at all vis-a-vis trainees such as Jack and Thelma Heath, it was CCS—and not ASTA.[8]

It is concededly true, as the plaintiffs implore, that ASTA's role went a bit beyond merely stowing aspirants in particular berths. For example, ASTA also endeavored to make certain that the trainees whom it placed enjoyed a safe and beneficial experience. Nevertheless, this undertaking did not vault ASTA into the relationship of an "employer" vis-a-vis the recruits. To argue otherwise requires a quantum leap of logic so great as to defy common sense. Congress never intended that the burdens of the Jones Act apply to one in ASTA's circumstances.

ASTA operated what amounted to a placement service. For a fee, it matched individuals with sailing ships for particular cruises. Even where hired hands were involved, several courts have held that a maritime agency which negotiates employment contracts and places seamen in shipboard niches cannot be deemed an "employer" under the Jones Act. *See Volyrakis v. M/V Isabell,* 668 F.2d 863, 866 (5th Cir. 1982); *Stamoulos v. Howland Panama S.A.,* 610 F.Supp. 454, 456 (E.D.La.1985). Certainly, the case at bar—involving as it does unpaid volunteers—is a much weaker one for the imposition of Jones Act liability.

The Heaths were not in an employer-employee relationship with ASTA. Thus,

---

7. Weschler, a retired vice-admiral of the United States Navy, was a knowledgeable spokesperson. His authority to bind ASTA in respect to these arrangements has not been called into question.

8. The ASTA defendants argue that, even given the elastic definition of employment which has characterized the Jones Act, the Heaths were simply not "employees" at all in respect to the final voyage of the Marques. The court need not sweep so broadly. Inasmuch as only the

ASTA defendants have moved for summary judgment at this juncture, the court's holding that the plaintiffs' decedents were not employees of ASTA is determinative of the insufficiency of the Jones Act counts as to the movants. The court does not purport to decide—and expresses no opinion on—the question of whether or not the decedents were employees of CCS (the vessel owner) within the contemplation of 46 U.S.C. § 688.

their Jones Act claims, viz., Counts XVI and XVII of the complaint, must fail as against that entity. And, the remaining movants are entitled to *brevis* disposition in their favor on these counts as well. If, as a matter of law, ASTA cannot be said to be the "employer" of the plaintiffs' decedents for Jones Act purposes, then a fortiori, the individual officers and directors of the organization are on this record similarly exempted from liability.

### 2. *Sufficiency of foreign law claim.*

As noted previously, *see ante* Part V(A)(4), foreign law claims are protected from DOHSA preemption by the express terms of 46 U.S.C. § 764. But, the plaintiffs have identified no law of any foreign nation granting to them a right of action applicable to the facts of this case. It is, of course, the plaintiffs' burden to make this showing. *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647 n. 1 (9th Cir.1981). *Cf.* Fed.R.Civ.P. 44.1 (requiring party who intends to raise issue concerning law of foreign country to give notice in pleadings or other seasonable written notice). The Advisory Committee Notes to Rule 44.1 further make clear that while a court may conduct research into foreign law independent of what has been adduced by the parties, it is "[on the other hand ... free to insist on a complete presentation by counsel."

In the absence of some meaningful demonstration that there is an applicable foreign law which cedes rights to these plaintiffs, Count XVIII of the complaint, like the storied lady of the evening, is without visible means of support. There is nothing upon which any claim can be founded. It is not the court's duty, unaided by the plaintiffs, to scour the annals of the law of the several sovereign states which comprise the United Kingdom in an effort to locate or to fashion a hook upon which Count XVIII can be hung.

As to this count, the ASTA defendants' motion for summary judgment is treated as a motion for dismissal, and Count XVIII of the complaint is dismissed without prejudice to a subsequent (timely) motion to renew the claim upon a specifically identified basis in foreign law.

### 3. *Sufficiency of rebate claim.*

Count XIII of the complaint has not been preempted by DOHSA. *See ante* Part V(A)(2). It seeks a refund of the fees paid by the Heaths to ASTA, claiming breach of the contracts under which the payments were tendered and accepted. The plaintiffs argue persuasively that there are issues of material fact as to whether ASTA kept the promises on its part to be performed, and the movants do not deign to address this contention in any serious manner. The motion for summary judgment as to Count XIII of the complaint is denied.

### VI.

There remains for disposition only the motion to strike the plaintiffs' demand for jury trial. And, the rulings reflected herein ineluctably dictate the fate of the motion to strike.

The parties are in agreement that, under ordinary circumstances, the DOHSA claims are triable in admiralty to the court, without the intervention of a jury. *See* 46 U.S.C. § 761 (action must be brought as one "in admiralty"). *See also* Fed.R.Civ.P. 38(e) (no right to jury trial in admiralty action). The plaintiffs argue, however, that when DOHSA claims are joined with other claims triable by jury, and the "facts are identical under each claim, as they are here, [the] pleas will be joined for trial by jury to promote efficiency and because there is nothing in [the legislative] history evidencing a policy reason to prevent it." Plaintiff's Memorandum in Opposition to Motion to Strike at 16, citing *Red Star Towing & Transportation Co. v. Cargo Ship Ming Giant*, 552 F.Supp. 367, 371 (S.D.N.Y.1982) (joinder of DOHSA claims with Jones Act claims).

Given the present posture of the record, this court need not venture into such turbulent waters. As to the movants, the state law wrongful death claims have vanished, *see ante* Part V(A)(1), and the Jones Act

claims have likewise dropped from the case. *See ante* Part V(B)(1). The breach-of-contract-resulting-in-death claims (Counts XI and XII) have been terminated. *See ante* Part V(A)(2). In any event, these claims would have had to be adjudicated under admiralty principles, as they involved supposed maritime contracts for passage, *see Nacirema Operating Co. v. Johnson,* 396 U.S. at 215 n. 7, 90 S.Ct. at 350 n. 7, and were thus incapable of sustaining the plaintiffs' jury demand. *See* Fed.R.Civ.P. 9(h) (no right to jury trial in admiralty suits except as expressly provided to the contrary by statute). *See also Natasha Inc. v. Evita Marine Charters, Inc.,* 763 F.2d at 470. The passage-money refund claim contained in Count XIII (which remains in the case) is maritime in nature and falls into the same classification.[9]

Thus, there are no remaining claims triable by jury implicating the movants upon which the proposed jury interposition can be piggybacked. Even if the plaintiffs can belatedly surface an authentic foreign law claim, *see ante* Part V(B)(2), any such claim would, as a matter of federal statutory law, be triable only to the court. *See* 46 U.S.C. § 764 ("Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate action *in admiralty* in the courts of the United States....") (emphasis supplied). Accordingly, there is no enduring foundation, even on the plaintiffs' theory of the matter, upon which the structure of their jury claim can stand vis-a-vis the petitioning defendants. The motion to strike must therefore be granted, and a nonjury pretrial order entered.[10]

### VII.

The sun has set on this court's journey past the reefs and shoals of the points raised by the parties. To recapitulate briefly, the court holds that all of the ASTA defendants are entitled to the entry of summary judgment in their favor on each and all of the pleaded state law wrongful death claims and the asserted Jones Act claims. Counts XI and XII are but thinly-veiled imitations of the wrongful death claims which, whether viewed under state law or under the general federal maritime common law, are wholly proscribed; ASTA is therefore entitled to the entry of summary judgment in its favor as to those counts. And, the foreign law claims are dismissed without prejudice in the manner heretofore described. *See ante* Part V(B)(2).

Insofar as the pending motions implicate the sufficiency of Count XIII (the passage-money rebate claim), summary judgment is denied. Similarly, the DOHSA claims (Counts XIV and XV) remain zoetic as to all defendants named therein.

Given the configuration of the record which will result from these rulings and orders, there are no live issues triable by jury as between the plaintiffs and the ASTA defendants. So, the latter's motion to strike the jury demand must be honored.

ASTA having substantially prevailed on the matters presently before the court, its counsel will promptly prepare and present for entry a form of order consonant herewith.

*Settle order on notice.*

---

9. Moreover, Count XIII does not present any meaningful identity of issues with the DOHSA counts. There is no way that the court could permit the $1400 rebate claim to be the tail that wagged the litigation dog.

10. The plaintiffs, of course, may yet have a viable Jones Act claim against the owners of the Marques. *See ante* n. 8. If that proves so, some severance or bifurcation order may be appropriate in the future to preserve an entitlement to trial by jury on that foray. The court expresses no opinion as to how that aspect of the litigation ought to be dealt with in the future. After all, none of the shipowner/defendants have as yet moved for brevis disposition of any of the claims against them.