**In the Matter of the Complaint of Charles L. FALKINER and Margaret B. Falkiner, as Owners of the Auxiliary Sailing VESSEL WAN FU, for Exoneration from or Limitation of Liability.**

Civ. A. No. 87–751–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 5, 1988.

Morton H. Clark, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiffs.

Stanley E. Sacks, Michael F. Imprevento, Sacks & Sacks, Norfolk, Va., for claimant Thomas Owens.

James C. Hawks, Levin, Hawks & Associates, Portsmouth, Va., for claimant Lee Erickson.

Charles W. Hawks, Jr., Portsmouth, Va.

## MEMORANDUM OPINION AND ORDER

DOUMAR, District Judge.

This case arises from a black powder flash fire which occurred aboard the yacht WAN FU during a mock pirate battle on the Elizabeth River in the vicinity of Norfolk's Town Point Park. The pirate battle was staged as part of the festivities of the 1987 Norfolk Harborfest. Two cannoneers firing two black powder cannons which they brought aboard the WAN FU and a nearby friend of one of the cannoneers suffered burn injury in the fire.

As the owners of the WAN FU, the plaintiffs initiated this action pursuant to the Limitation of Liability Act of 1851, 46 U.S.C.App. sections 182–183, seeking exoneration from liability arising from this fire or limitation of liability to the value of their yacht. Pursuant to Rule F(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims, the cannoneers and the friend filed claims against the plaintiffs as well as answers to the plaintiffs' complaint contesting the plaintiffs' right to exonera-

tion or to limitation. Prior to the plaintiffs' initiation of this action, one of the cannoneers, Thomas D. Owen, Jr., had commenced an action at law against the plaintiffs and other parties in Norfolk Circuit Court. The other cannoneer, Lee Erickson, alleges that a restraining order issued by this Court staying all other actions then pending and enjoining all future actions with relation to the WAN FU pirate battle fire until further order of the Court prevented him from commencing an action at law against the plaintiffs in Norfolk Circuit Court.

All three claimants predicated their claims against the plaintiffs on the Jones Act, 46 U.S.C. app. section 688, as well as on general maritime law. All of the parties briefed and argued whether the claimants were "seamen" under the Jones Act and therefore owed a warranty of the WAN FU's seaworthiness by the plaintiffs and whether the plaintiffs are entitled to exoneration or limitation of liability. The Court heard evidence pertaining to these issues during two days of trial. They are now ready for decision.

As set forth below, the Court finds that the claimants were not seamen within the purview of the Jones Act and that the plaintiffs did not owe the claimants a warranty of seaworthiness. In order to preserve the claimants' choice of forum prerogative and right to jury trials, the Court is not ruling on whether the plaintiffs breached any duty owed to the claimants or whether any such breach is causally connected to the claimants' injuries so as to give rise to liability. The Court does find, however, that the plaintiffs would not be entitled to limit their liability to the value of the WAN FU should liability arise in further proceedings based upon the alleged negligence of Mr. Falkiner.

## I. FINDINGS OF FACT

1. The plaintiffs in this action, Charles and Margaret Falkiner, are the individual co-owners of the yacht WAN FU. Mr. Falkiner holds 33 shares and Mrs. Falkiner holds 31 shares. The WAN FU is registered in Australia. Tr. at 44.

2. The WAN FU is a three-masted steel Chinese junk. The yacht is 60 feet long, 14 feet in beam, with a draft of 6 feet. It is divided into six watertight compartments and has an 85 horsepower diesel engine and a diesel generator. Tr. at 44. A forward cabin separates the foredeck from the center deck and an after cabin separates the center deck from the stern deck. The helm is located on the stern deck.

3. The WAN FU was built for the Falkiners, according to plans provided by them, in Melbourne, Australia. The vessel's intended service is as a pleasure yacht. Pretrial Exhibit No. 2. Immediately following completion of construction of the yacht, the Falkiners sailed the WAN FU across the Indian and Atlantic Oceans to Norfolk, Virginia. On this voyage, the Falkiner family and friends comprised the crew. Since arriving on December 23, 1977, the WAN FU has been based in Norfolk. Tr. at 45–46.

4. Mr. Falkiner is a graduate of the Royal Australian Naval College and served twenty-three years as an officer in the Royal Australian Navy. Mr. Falkiner retired at his own request with the rank of lieutenant commander. Tr. at 46, 76. While in the Navy, Mr. Falkiner served as a gunnery officer and as the executive officer of a destroyer. Tr. at 67, 76. Mr. Falkiner is licensed as a master (ship captain) in Australia. Tr. at 67.

5. The Falkiners and the WAN FU have participated in every annual Norfolk Harborfest since 1978 except one. They had participated in four or five pirate battles previous to 1987. Tr. at 47, 166. Tim Jones, the City of Norfolk Cultural Affairs Coordinator and member of the Harborfest Executive Committee, created the pirate battle in 1976 to simulate a sea battle. Tr. at 162, 166–167.

6. The Falkiners received an official invitation to participate in the 1987 Harborfest from the Mayor of Norfolk and a follow-up letter from Jones. The Falkiners agreed to participate. Tr. at 47. As in all previous years, the Falkiners did not receive any payment for their or the WAN FU's participation in the 1987 Harborfest. Tr. at 166. This was a festival with thou-

sands of volunteers from the major cities bordering the Elizabeth River and Hampton Roads participating in its community activity.

7. On Saturday morning, June 6, 1987, the WAN FU was berthed in the marina on the Elizabeth River opposite Waterside. Tr. at 48. A meeting for the pirate battle ship captains and cannoneers was held at 9:00 o'clock that Saturday morning. At this meeting, the captains received a briefing on the basic rules of engagement for the battle, communications, and what to do in the event of an emergency. Tr. at 48, 168.

8. At the Saturday morning meeting, Jones asked which ship captains needed cannons and cannoneers. Mr. Falkiner indicated that the WAN FU needed both. Owens and Erickson were directed to the WAN FU by Jones. Tr. at 49, 246. Owens and Erickson were not selected by Mr. Falkiner. Tr. at 50–51. He had no say in who they were or what were their qualifications. This was the function of the festival committee and the individual cannoneers themselves. Owens had been directed to the WAN FU for the 1986 Harborfest pirate battle with a more senior cannoneer, a Mr. Wainwright. Tr. at 142. The 1986 pirate battle was called off before completion and Wainwright and Owen fired only three or four shots before the battle was canceled because of inclement weather. Tr. at 271–272.

9. In 1987 Owen had been firing black powder cannons for five years. Tr. at 275. In that year he owned six cannons which had been built to his explicit specifications. Tr. at 268, 275. Owen had fired his cannons during the 1985 and 1986 Harborfest pirate battles. Tr. at 267, 272. Owen considered himself to be an experienced cannoneer. Tr. at 269, 275.

10. Erickson had first become interested in firing black powder cannons in 1985 from his friendship with Owen. Owen had taken Erickson to empty fields to fire cannons on at least two occasions prior to the pirate battle of 1987. Erickson Deposition at 8–9. Owen gave Erickson basic instruction in firing cannons and Erickson had

purchased a cannon from Owen. Erickson Deposition at 8, 11. Owen considered Erickson to be a competent cannoneer and invited Erickson to participate with him in the 1987 Harborfest pirate battle. Tr. at 276. This was the first time that Erickson participated in a Harborfest pirate battle. Erickson Deposition at 12.

11. Following the Saturday morning briefing, Owens, Erickson, and Wainwright took two two-inch bore black powder cannons aboard the WAN FU. Tr. at 246, 277. Both cannons belonged to Owen. Tr. at 276. Mr. Falkiner directed the cannoneers to place Owen's cannons on the center deck, Tr. at 50, 246, area approximately ten feet square. Tr. at 251, 429. Mr. Falkiner placed a canvass on the port side of the center deck and directed that the cannons be lashed down on top of the canvas. Tr. at 436, 91, 247. Mr. Falkiner provided the cannoneers with cord or rope with which to lash the cannons to the deck railing and a hatch cover. Tr. at 92–93. Mr. Falkiner observed the cannoneers lashing the cannons and made sure that the cannons were securely tied. *Id.*

12. The Harborfest Committee provided the black powder and fuses for the pirate battle through a local gun shop. Tr. at 168, 50. An individual from the gun shop distributed the powder and fuses to the captains of the ships and required a signature of receipt. Tr. at 50, 97, 248. Mr. Falkiner and John Brink, the Harborfest liaison officer to the WAN FU, picked up the powder and fuses for the WAN FU. Tr. at 97, 146. Either Falkiner or Brink signed for them and Brink, accompanied by Falkiner, carried the powder and fuses to the WAN FU. Tr. at 51, 97–99.

13. The powder and fuses for the WAN FU were in a cardboard box approximately 12 inches by 18 inches. The powder was contained inside one-pound tin cans with screw-top caps. Tr. at 51, 250, 270, 337–338. When the box containing the powder was brought on board the WAN FU, it was placed on the stern deck. Tr. at 51, 99. The box contained approximately ten tins of powder. Tr. at 98, 337.

14. Owen and Erickson poured black powder from the tins into plastic sandwich bags, which were rolled up and taped to form cannon charges. Tr. at 52, 250. Utilizing plastic bag charges was Owen's customary practice. Tr. at 270. Approximately eight or nine pounds of black powder were used to make up approximately thirty-five charges. Tr. at 250, 337. Additional powder may have been brought on board the WAN FU and placed inside the cardboard box either made up as charges or remaining in tins. Tr. at 337, 251. Once made up, the charges were placed in the cardboard box. Tr. at 106–107, 250. Mr. Falkiner observed Owen and Erickson making the charges, Tr. at 100, 250, and either Mrs. or Mr. Falkiner asked them to make charges that would make less noise than the charges fired the previous year. Tr. at 52, 106, 249–250. There was no discussion between the cannoneers and Mr. Falkiner concerning placing the charges in the cardboard box or in any other container. Tr. at 108, 251.

15. When Owen and Erickson completed making the cannon charges and cutting the fuses into shorter pieces, Tr. at 250, 254; Erickson Deposition at 25, one of them carried the cardboard box containing the charges from the stern deck to the center deck, where the cannons were located. Tr. at 251; Erickson Deposition at 28. The box was placed to the left of the cannon (facing port) either on top of a water tank, Tr. at 251, 278, or at the base of the water tank on the deck. Erickson Deposition at 28; Tr. at 432. The box of charges was approximately eight feet from the cannons. Erickson Deposition at 29; Hall Deposition at 14; Tr. at 126. Owen did not consider placing the box under a cover. Tr. at 280.

16. When the WAN FU got underway for the pirate battle, eight members of the Virginia Militia musketeers were on the foredeck, family and friends of the musketeers and other guests, as well as the crew of the WAN FU, were either up in the bow or on the stern deck. Tr. at 53–54, 56. Mr. Falkiner was at the wheel, and Mrs. Falkiner was to his right. Tr. at 54. As people had come on board the WAN FU, Mr. Falk-iner instructed them to keep clear of the center deck and the foredeck. Tr. at 56. Owen and Erickson were on the center deck with the cannons. *Id.* paragraph 17. Mary Hall, a co-employee with Owen at the Norfolk Naval Shipyard, Hall Deposition at 4, 6–7, happened to meet Owen and Erickson at the marina prior to the commencement of the pirate battle. Hall expressed an interest in going out on the WAN FU during the battle and Owen asked Mr. Falkiner if she could come aboard. Mr. Falkiner gave his permission for her to do so. Hall Deposition at 9; Tr. at 256. Mr. Falkiner did not make any inquiry into what Hall's role aboard the WAN FU would be. Tr. at 125. When the WAN GU got underway, Mr. Falkiner observed Hall sitting against a companionway entrance on the fore end of the center deck. Tr. at 56–57.

17. Mr. Falkiner received the signal for the battle to begin over the yacht's radio and he gave the order for the cannoneers to commence firing. Tr. at 127, 257–258. Erickson loaded the charges into the cannons and Owen fired the cannons. Tr. at 258; Erickson Deposition at 33. Owen would insert a fuse into the fuse hole at the back of the cannon barrels and Erickson would press the charge home. Tr. at 258. Owen would then ignite the fuse with a lighted cigar from his mouth. Tr. at 304–305. Because he only had one arm, Owen gave a handful of fuses to Hall so that she could hand them to him one at a time. Tr. at 282; Hall Deposition at 14–15. While the cannons were being fired, Hall was sitting on the center deck with her back inside the open companionway. Tr. at 295; Hall Deposition at 16. Owen did not put the cardboard box containing the charges and the fuses near Hall because he did not want her to handle the powder. Tr. at 297. Owen did not consider Hall to be a participant in the battle; he considered her to be a guest. *Id.* During the course of the approximately seven or eight successful cannon shots, Tr. at 259, 302; Hall Deposition at 17, both Owen and Erickson went over to the cardboard box and took out

charges to be placed in the cannons. Tr. at 303, 305; Erickson Deposition at 33.

18. Prior to the flash fire, one shot misfired. The cannoneers noticed that the fuse burned slowly and irregularly, and then the cannon did not fire. Tr. at 260. The cannoneers waited three or four minutes and then made sure that the charge was all of the way home. Another fuse was inserted and this time the cannon fired. *Id.*

19. The cannoneers fired a few more shots after the misfire and then loaded another shot. Owen lit the fuse and noticed that this fuse was also burning irregularly. The cannon fired and a flash fire of the cardboard box containing the remaining charges and powder occurred.

20. Owen, Erickson, and Hall received burn injury. Owen and Erickson jumped overboard; Hall remained on board the WAN FU. Emergency assistance and procedures were initiated immediately by the Falkiners. The Coast Guard made a cursory investigation of the flash fire but did not submit any report. Tr. at 63.

21. Based on the above findings of fact and upon all of the evidence before the Court, the Court also makes the following findings of fact:

A. At all times relevant to this action, the WAN FU was berthed upon or was plying navigable waters of the United States;

B. The cannoneers aboard the WAN FU, Owen and Erickson, were not seamen. The cannoneers were not employees of the Falkiners and they were not members of the WAN FU's crew but invitees, licensees, or joint venturers aboard the WAN FU for their own benefit or pleasure as well as for the benefit of the festival;

C. Hall was not a seaman or an invitee aboard the WAN FU but rather a social guest at her specific request;

D. Mr. Falkiner had actual knowledge that the cannon charges were made up with plastic sandwich bags and that the charges were placed in a cardboard box;

E. Mr. Falkiner had actual knowledge that, as the WAN FU was preparing to begin engagement in the mock pirate battle, Hall was sitting on the center deck.

## II. CONCLUSIONS OF LAW

1. The claimants in this action, Owen, Erickson, and Hall, were not within the purview of the Jones Act, and accordingly, the plaintiffs did not owe the claimants a warranty of the WAN FU's seaworthiness.

2. Any liability of the Falkiners to the claimants which may arise from the flash fire aboard the WAN FU would derive from negligence and the corresponding duties of one to the other.

3. Should liability arise to the claimants or to any one of them, the plaintiffs cannot limit this liability under the Limitation of Liability Act because the liability would derive from the negligence of Mr. Falkiner, a co-owner and the captain of the vessel, and his negligence would necessarily be based upon facts and circumstances within his privity or knowledge.

## III. DISCUSSION

Subsequent to Owen's initiation of a suit against them in Norfolk Circuit Court, the plaintiffs filed this action seeking exoneration or limitation of liability pursuant to 46 U.S.C. app. section 183. This section provides:

> The liability of the owner of any vessel, whether American or foreign, for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C. app. section 183(a).

The plaintiffs argued that they are entitled to exoneration because the claimants' injuries resulted from the negligent acts of the cannoneers and that they, the plaintiffs, were without fault. The plaintiffs also argued that the cause of the flash fire aboard the WAN FU was not within their privity or knowledge, so that if subject to

liability, their liability must be limited to the value of the yacht.

The claimants argued two theories of the plaintiffs' liability. First, they argued that while on board the WAN FU, they were seamen within the purview of the Jones Act and that accordingly the plaintiffs owed them a warranty of seaworthiness. The claimants argued that the WAN FU was an unseaworthy vessel for purposes of the pirate battle. Additionally, the claimants argued that Mr. Falkiner was negligent in not providing the cannoneers with an appropriate "magazine" in which to store the cannon charges. The claimants argued that the plaintiffs are not entitled to limit liability arising under either theory because the circumstances rendering the WAN FU unseaworthy and the negligence of Mr. Falkiner were within his privity or knowledge.

### A. *Exoneration From or Limitation of Liability*

■ The Supreme Court and the Fourth Circuit have both clearly indicated that the primary purpose of an exoneration or limitation of liability action by vessel owners in federal admiralty court is to ensure the fair distribution of a limitation fund among all claimants. *See Lake Tankers Corporation v. Henn*, 354 U.S. 147, 151, 77 S.Ct. 1269, 1271–1272, 1 L.Ed.2d 1246 (1957); *Wheeler v. Marine Navigation Sulphur Carriers, Inc.*, 764 F.2d 1008, 1011 (4th Cir.1985). If concursus of a limitation fund is not necessary because the value of the vessel is equal to or exceeds the amount of all claims against its owners, *Lake Tankers*, or the district court finds that the owners are not entitled to limit their liability to the value of the vessel, *Marine Navigation*, these cases instruct the district

court to permit the claimants to choose whether to remain in federal admiralty court or whether to pursue their claims in state court. *See Lake Tankers*, 354 U.S. at 153, 77 S.Ct. at 1273; *Marine Navigation*, 764 F.2d at 1011. *See also Fecht v. Makowski*, 406 F.2d 721, 722–723 (5th Cir. 1969) (when apparent that limitation of liability cannot be granted, it is improper for the district court to adjudicate the issue of liability over the objection of the claimants).

In order to protect the claimants' choice of forum and rights to jury trials, the Court expressly reserves decision on the plaintiffs' liability or exoneration from liability with relation to the alleged negligence of Mr. Falkiner but specifically finds that there is no liability on the basis of unseaworthiness.[1] The Court does find, however, that should liability be found on the basis of negligence on the part of Mr. Falkiner, the plaintiffs are not entitled to limit that liability to the value of the vessel under the facts presented herein.

■ The Limitation Act limits the liability of vessel [2] owners where the damage or injury occurs without the "privity or knowledge" of the vessel's owner or owners. 46 U.S.C. app. section 183(a). Where a vessel is owned by two co-owners, the privity or knowledge of one co-owner is attributed to the other. *See Fecht v. Makowski*, 406 F.2d 721, 723 (5th Cir.1969).

Privity or knowledge under the Act has been frequently defined as:

[P]ersonal participation of the owner in some fault, or act of negligence, causing or contributing to the loss, or some personal knowledge or means of knowledge, of which he is bound to avail himself of a contemplated loss, or a condition of

---

**1.** The Court recognizes that this disposition is contrary to those cases which indicate that the district court should first determine unseaworthiness or negligence questions—whether there is liability at all—and only then determine whether the vessel owner lacked privity or knowledge. *See, e.g., Petition of M/V Sunshine, II*, 808 F.2d 762, 764 (11th Cir.1987); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976). The Court views this line of cases as prescribing the procedure of analysis and burdens of proof in exoneration or limitation proceedings where

choice of forum and jury rights are not a factor. *See* 808 F.2d at 764 (for the convenience of the parties, general liability is ordinarily heard along with the petition for limitation).

**2.** It is beyond doubt that the WAN FU is a "vessel" within the purview of the Limitation of Liability Act. *See Complaint of Shaw*, 846 F.2d 73 (4th Cir.1988) (reversing district court's holding that Limitation of Liability Act does not encompass pleasure boats).

things likely to produce or contribute to the loss, without adopting appropriate means to prevent it. 3 Benedict, *Admiralty*, section 41, at 5–3 (1986) (*quoting Lord v. Goodall, Nelson & Perkins S.S. Co.*, 15 F.Cas. 8,506 (C.C.Cal. 1877), *aff'd*, 102 U.S. (12 Otto) 541, 26 L.Ed. 224 (1881)). *See Petition of M/V Sunshine, II*, 808 F.2d 762, 763–764 (11th Cir. 1987).

■ As discussed below, the Court finds that the plaintiffs did not owe the claimants a warranty of the WAN FU's seaworthiness and specifically so finds and exonerates the Falkiners from liability by virtue of any claim for unseaworthiness. The claimants' remaining claims against the plaintiffs are based upon alleged direct negligence of Mr. Falkiner in either creating or allowing a dangerous situation to exist aboard the WAN FU.[3] Whether or not Mr. Falkiner was negligent, he did possess actual knowledge of the composition and storage of the cannon charges and of the location of the claimants during the mock pirate battle. Should Mr. Falkiner be found negligent for these reasons, the plaintiffs cannot limit their liability to the value of the WAN FU.

### B. *Status of the Claimants*

The claimants submitted for decision to this Court,[4] and vigorously argued, the issue of their status as seamen within the purview of the Jones Act, 46 U.S.C. app. section 688. The Court finds that the claimants were neither employees of the plaintiffs nor seamen and that the plaintiffs did not owe the claimants a warranty of the WAN FU's seaworthiness.

■ A vessel owner owes a warranty of seaworthiness to members of the vessel's crew but not to those aboard the vessel as licenses or guests. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 629–630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959); Schoenbaum, *Admiralty and Maritime Law*, section 4–5 at 134 (1987). This principle is codified in the Jones Act, 46 U.S.C. app. section 688, which provides:

> Any *seaman* who shall suffer personal injury *in the course of his employment* may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply....

46 U.S.C. app. subsection 688(a) (emphasis added). In order for the plaintiffs to have owed the claimants a warranty of seaworthiness, the claimants must have been within an employee-employer relationship with the plaintiffs and to have been "seamen."

■ Whether an employee-employer relationship existed between the claimants and the plaintiffs is determined under common law standards. *Heath v. American Sail Training Association*, 644 F.Supp. 1459, 1468–1469 (D.R.I.1986); *Petition of Read*, 224 F.Supp. 241, 246 (S.D.Fla.1963). Under the common law, four elements are considered in determining whether an employment relationship exists: (i) the selection and engagement of the putative employee, (ii) whether wages are paid, (iii) the power of dismissal, and (iv) the power of control over the one alleged to be an employee. 53 Am.Jur.2d, *Master and Servant*, section 2 at 82 (1970). Of these four factors, payment of wages is the least important while power of control, including the right to direct the manner in which the work is to be done, is the most important.

**3.** The claimants argued that Mr. Falkiner was negligent *per se* because he failed to provide a proper magazine for the storage of the black powder aboard the WAN FU as required by section 17.96 of the Ordinances of the City of Norfolk. Although the applicability and any violation of this ordinance are matters for decision by a court, the issue of negligence *per se* is intertwined with the issues of the standard of care owed to the claimants, and whether the cannoneers can rid themselves of their specialty, causation, and participation. Accordingly, the Court reserves decision on this issue.

**4.** "In considering [the plaintiffs'] petition, the Court must first resolve the status of the claimants." Claimants Erickson and Hall's Written Final Argument at 3. *See* Claimant Owen's Post–Trial Memorandum at 8–10.

*Id.* at 82–83. *See American Sail Training,* 644 F.Supp. at 1468–1469.

■ Applying these four factors, the Court finds that the cannoneers aboard the WAN FU were not "employees" of the plaintiffs.[5] Owen and Erickson were not selected by either of the Falkiners to participate in the pirate battle aboard the WAN FU, but rather were directed to the vessel by Jones. The Falkiners did not pay them any compensation. They were voluntary participants in their own amusement. They, together with the Falkiners, were jointly participating in a mock pirate battle. Owen and Erickson were to provide the cannons and to fire them. The Falkiners were to supply the platform. Jointly they were participating in a mock pirate battle sponsored by the Harborfest Committee. Most importantly, however, the control that the Falkiners exercised over the cannoneers was exclusively the control which Mr. Falkiner exercised as captain of the vessel over all of those aboard. At no time did the Falkiners exercise control over the operation of the cannons or the cannon charges. Moreover, they were not performing a service normally provided by the crew of the WAN FU. They were providing their own distinct service. Broken down into basics, on one hand were cannoneers who enjoyed and took pleasure from firing their cannons. On the other hand were pleasure boat owners who derived pleasure from participating in a city festival. The Harborfest Committee brought these two groups together to stage the mock pirate battle.

The claimants place great emphasis on Mr. Falkiner's directing the placement of the cannons on the center deck, observing them being lashed to the deck, indicating that the charges should be made with less noise than the previous year, and giving the order for the cannoneers to commence firing. The Court finds, however, that Mr. Falkiner's directions regarding the placement of the cannon and their being lashed to the deck were derived from Mr. Falkiner's responsibility and control over the general safety of the WAN FU and were not given from an assumption of control over the cannoneers *qua* cannoneers. The Court finds that the instruction for the charges to be made up lighter than the year before was a request, and that insofar as the order to "commence firing" was authoritative its solemnity was symbolic, consonant with the mock pirate battle.

■ The claimants also fail to come within the purview of the Jones Act because they were not seamen aboard the WAN FU. The classic three-part test of seamen status is set forth in *Bullis v. Twentieth Century-Fox Film Corporation,* 474 F.2d 392, 393 (9th Cir.1973).

> There are three essential elements in the term "seamen" as used in the Jones Act. First, the vessel on which the claimant is employed must be in navigation. Second, there must be a more or less permanent connection with the vessel, and third, the claimant must be aboard primarily to aid in navigation.

*Id.* (*quoting Bodden v. Coordinated Caribbean Transport, Inc.,* 369 F.2d 273, 274 (5th Cir.1966).

Although the WAN FU was in navigation when the flash fire occurred, the claimants do not meet the second or third elements of the test. In *Bullis,* the court found that the claimants, off-duty servicemen hired for one day only as extras in the filming of a battle scene, lacked more or less permanent attachment to the vessel and that they were therefore not seamen. *See* 474 F.2d at 394. The connection may be less permanent, the court observed, but it cannot be temporary or transitory. *Id.*

The claimants were in no way permanently attached to the WAN FU. Although Owen had participated aboard the yacht in the previous year's Harborfest pirate battle, he was reassigned in 1987 based on his own preference. Neither Er-

---

**5.** By no stretch of the imagination could claimant Hall be considered the plaintiffs' employee during the pirate battle. Hall was aboard the WAN FU as a social guest at her own request and Mr. Falkiner had actual knowledge that she was not aboard as a cannoneer. As a spectator she held cannon fuses for Owen, but this limited involvement in the cannon firing did not make her an employee of the Falkiners. Claimant Hall was a social guest.

ickson nor Hall had ever before been aboard the WAN FU, nor was there any indication that, in the absence of the flash fire, any of the claimants would again be aboard the yacht.

Finally, the claimants have failed to meet the third element of the seamen test, that they were aboard the vessel primarily to aid in navigation. The Court does read this element as requiring the claimants to have been participating in the actual navigation or propulsion of the vessel, but rather that they were performing some type of work typically performed by the WAN FU's crew. The Court finds that the crew of the WAN FU did not operate black powder cannons and that simply because cannoneers were allowed or licensed to come aboard the yacht to participate in the mock pirate battle did not make Owen and Erickson members of its crew.[6]

The claimants' claims based upon breach of warranty of seaworthiness or upon the unseaworthiness of the WAN FU are ORDERED DISMISSED with prejudice. Normally, a claim of negligence or lack of negligence should be decided on a petition for exoneration from or limitation of liability. However, claims of negligence, contributory negligence, and assumption of risk are questions particularly suited for a jury, and this is particularly true with regard to claimant Hall. Under the facts presented in this Court, the direct negligence of the cannoneers would necessarily be a question to be decided. This Court will give the claimants an opportunity to choose their forum and to avail themselves of their rights to jury trials.

For the reasons discussed above, the plaintiffs' petition for limitation of liability based on negligence is DENIED. The plaintiffs' petition for exoneration from liability based on negligence is RESERVED for resolution upon the claimants' election of their choice of forum. Claimants Owen, Erickson, and Hall are DIRECTED to elect whether they wish to obtain decision on the question of the plaintiffs' liability in this

Court or wish to pursue their claims in state court by notifying this Court of their election in writing within fourteen (14) days of the date of this order. It is further ORDERED that the order of this Court dated October 27, 1987 restraining the commencement of any actions against the plaintiffs, and the further prosecution of any actions then pending with the exception of this action, relating to the flash fire of June 6, 1987 aboard the WAN FU is hereby continued in effect until further order of this Court for a determination of whether or not the claimants or any of them elect to remain in this Court. In accordance with the findings and conclusions of this order, if they elect not to remain, the stay will be vacated on application as to any such claimant, subject to the rights of the parties herein to apply for a stay of this order for purposes of appeal.

IT IS SO ORDERED.

---

**6.** Claimant Hall's handing fuses to Owen did not significantly contribute to the work of the cannoneers and did not rise to the level of performing work as a cannoneer. Accordingly, the Court finds that Hall performed no work aboard the WAN FU.