76 F.3d 1045
 1996 A.M.C. 897, 96 Cal. Daily Op. Serv. 1031,
96 Daily Journal D.A.R. 1726
 BOY SCOUTS OF AMERICA; Mount Diablo Silverado Council; M/V
St. Ambrose; Explorer/Sea Scout Post 248,
Plaintiffs-Appellees,
v.
Patrick Sean GRAHAM, Claimant-Appellant,
and
William Brazil, Claimant.
 No. 94-16609.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 4, 1995.
Decided Feb. 15, 1996.
 
 1
 David J. McMahon, Barger & Wolen, San Francisco, California, for plaintiffs-appellees.
 
 
 2
 Joseph W. Klobas, Law Office of Joseph W. Klobas, Santa Barbara, California, for claimant-appellant.
 
 
 3
 Appeal from the United States District Court for the Northern District of California, Marilyn H. Patel, District Judge, Presiding.
 
 
 4
 Before: GOODWIN and REINHARDT, Circuit Judges, and KING, District Judge.*
 
 SAMUEL P. KING, Senior District Judge:
 
 5
 Patrick Graham ("Graham") appealed from the summary judgment granted to the vessel owner and owner pro hac vice in their action for exoneration and limitation of liability. Graham was an adult volunteer and "mate" on an outing with the Sea Explorers, a nautical troop of boy scouts. Graham was injured when he dove into shallow water to swim to shore and secure the bowline. The main issue on appeal is whether the district court was correct when it found as a matter of law that Graham was not a seaman under the Jones Act. We find that there is a genuine issue of material fact, making summary adjudication improper, and reverse and remand.
 
 
 6
 Graham was a volunteer aboard The Ambrose, on a 10-day training cruise for a small troop of Sea Explorers. The unit for which Graham volunteered chartered a vessel from the Mt. Diablo Boy Scouts of America. Graham had previously been a Sea Explorer himself, and was serving as "mate" to the skipper, William Brazil. Brazil had selected Graham to assist him, and submitted Graham's application to the Mt. Diablo Council of Boy Scouts for approval. Both the adult volunteers and the children were required to pay annual registration fees and all were charged for expenses incurred during the cruise of The Ambrose. The activities of the voyage included training the children in navigation as well as recreation such as skiing and swimming. Graham and Brazil were the only two adults on board, and both had supervisory authority over the children.
 
 
 7
 On June 18, 1992, the third day of the trip, William Brazil was mooring the vessel off Brannan Island State Park. Brazil was supervising one scout who was at the helm. Graham and another scout had put out the stern anchor. Graham, intending to swim the bowline to shore to secure the boat, dove off the bow of the vessel into approximately three feet of water. He suffered quadriplegic injuries as a result of diving into the shallow water.
 
 
 8
 Brazil had not given any direct orders to Graham to leave the boat or to take the bowline to shore. There had been a brief meeting before mooring where Brazil determined that the bowline would be secured to an object on shore.
 
 
 9
 Graham filed a negligence claim against William Brazil in state court. The owner of the vessel, Mt. Diablo, and owner, pro hac vice, Post 248, filed this action for exoneration from or limitation of liability in district court pursuant to Federal Rule of Civil Procedure F. The deadline for filing claims and answers to the complaint, set by the district court, was September 14, 1993. On that day Graham filed an answer but made no affirmative claims. On September 17, without asking leave of the district court, Graham filed an amended answer which stated an affirmative claim seeking 10 million dollars in contribution and indemnity. The court allowed this amended answer to be filed. This amended answer alleges The Ambrose was unseaworthy and that the accident occurred because of the negligence of the personnel aboard.
 
 
 10
 On April 7, 1994, Graham asked for leave to file an amended claim. This amended claim added a claim under the Jones Act, 46 U.S.C.App. § 688, re-alleged that The Ambrose was unseaworthy and improperly manned, and changed the relief sought from contribution and indemnity to maintenance and cure. Appellees opposed the motion to amend and filed separate motions for summary judgment. The district court denied the motion to amend and ordered summary judgment against appellant.
 
 
 11
 We review grants of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995). The district court's denial of a motion to amend is reviewed for abuse of discretion. United States v. County of San Diego, 53 F.3d 965, 969 n. 6 (9th Cir.1995). Such a denial is strictly reviewed in light of the strong policy permitting amendment. Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1993).
 
 DISCUSSION
 
 12
 Jones Act protection extends to "[a]ny seaman who shall suffer personal injury in the course of his employment...." 46 U.S.C.App. § 688. The Jones Act does not define the term "seaman" and the question has been the subject of much litigation. Two recent Supreme Court cases address the question of who is a "seaman." Chandris, Inc. v. Latsis, --- U.S. ----, ----, 115 S.Ct. 2172, 2193, 132 L.Ed.2d 314 (1995); McDermott Int'l Inc. v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).
 
 
 13
 The test regarding who is a seaman under the Jones Act is a mixed question of law and fact. Wilander, 498 U.S. 337, 111 S.Ct. 807. "If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury." Id. at 356, 111 S.Ct. at 818. To qualify as a seaman under the Jones Act the worker must show two basic elements:
 
 
 14
 the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel in navigation ... that is substantial in terms of both its duration and nature.
 
 
 15
 Chandris, --- U.S. at ----, 115 S.Ct. at 2193. Chandris was decided after the briefing in this case and neither party submitted supplemental authority.
 
 
 16
 The previous test established in Bullis v. Twentieth Century-Fox Film Corp., 474 F.2d 392 (9th Cir.1973), included the "in aid of navigation" language and is no longer controlling. Under Wilander, the vessel needs to be one "in navigation," but the duties of the seaman do not need to be "in aid of navigation." There is no question that The Ambrose was a vessel in navigation.
 
 
 17
 Graham contributed to the operation of the vessel. The facts show that he was the "mate," and one of only two adult crew members aboard. Despite the lack of formally assigned duties, Graham was engaged in navigation, and in furthering the mission of the vessel, which was working with the boy scouts on board. He was, in the words of the Supreme Court, "doing the ship's work." Wilander, 498 U.S. at 355, 111 S.Ct. at 818.
 
 
 18
 The issue here is with the second part of the Chandris test and whether Graham's connection to the vessel was substantial in terms of both its duration and its nature. The Supreme Court has not addressed the issue of a gratuitous worker who is only occasionally at sea. The facts in both Wilander and Chandris involve professional seamen who were paid for full-time work. The disputes in those cases focus on whether the employee was engaged primarily in land based activities or primarily in the operation of the ship in navigable waters.
 
 
 19
 In this case, Graham was not doing any land-based work. When he was acting as mate of the vessel, he was closely associated with the ship. The cruise only lasted ten days, and Graham was not a professional seaman. The Supreme Court has said that the Jones Act is fundamentally status-based, "granting a cause of action to those maritime workers who form the ship's company." Chandris, --- U.S. at ----, 115 S.Ct. at 2186.
 
 
 20
 Although Chandris came down after the district court's order in this case, the district court relied on similar language: "seaman status is a jury question only if there is evidence that ... the plaintiff was 'assigned permanently to a vessel....' " citing Coats v. Penrod Drilling Corp., 5 F.3d 877, 890 (5th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1303, 127 L.Ed.2d 654 (1994) reh'g en banc granted, 20 F.3d 614 (1994), opinion reinstated in part, 61 F.3d 1113 (5th Cir.1995). The district court in this case concluded that Graham failed to satisfy his burden of showing that he had "more or less permanent status in an employment-related position." The new test, quoted above, is whether his connection was "substantial in terms of both its duration and nature." Chandris, --- U.S. at ----, 115 S.Ct. at 2193.
 
 
 21
 The district court's finding relied on the following facts:
 
 
 22
 (1) Graham was not paid for his services ...; (2) Graham viewed his status on board as that of a "volunteer" ...; (3) Graham was not "hired," but rather signed up with the Post as a volunteer adult supervisor ...; (4) Graham understood that part of his job on The Ambrose was to supervise and train the youths along with the Skipper, Mr. Brazil, as well as to serve as Brazil's mate ...; and (5) The Ambrose was not a commercial venture or on a serious training mission, but was engaged in a primarily recreational cruise that included skiing, suntanning, and swimming as well as basic, informal nautical instruction for the underage crew of Boy Scouts.
 
 
 23
 For the reasons set forth below, we find that the district court erred in finding that this factual situation could not lead any reasonable trier of fact to conclude that Graham was a seaman.
 
 
 24
 The purpose of the Jones Act is to protect maritime workers. It is ordinarily for the trier of fact to determine whether someone who does not work for wages is a maritime worker covered by the Jones Act. Only a few district courts have grappled with the issue of whether a gratuitous worker who is only occasionally at sea can be a seaman for Jones Act purposes.
 
 
 25
 A district court in Florida found that a person who volunteered to participate in a yacht race for personal pleasure, who was promised no wage or salary, but who was actually performing normal crew service when injured was a seaman under the Jones Act. Petition of Read, 224 F.Supp. 241 (D.C.Fla.1963).
 
 
 26
 A Rhode Island case involving similar, but not the same, circumstances, Heath v. American Sail Training Ass'n, 644 F.Supp. 1459 (D.R.I.1986) declined to grant seaman status to volunteer crew members. Heath held that no employment relationship existed between the organizer of a sail training program and the crew members, and that the crew members who were unpaid temporary volunteers, could not maintain a Jones Act claim against the organizer. 644 F.Supp. at 1470-71. Although this case is not binding on this Court, it is distinguishable. The Heath court found difficulty in establishing that there was an employer-employee relationship with the program organizer. Id. at 1469. The Heath court found it significant that the volunteers were not engaged for work purposes on ASTA's behalf; that the volunteers actually paid ASTA for the privilege of participation in the sailing event; that ASTA had no "meaningful power of dismissal over the trainees once the cruise began"; and that the volunteers were given considerable discretion in selecting what they wanted to do on the ship. Id.
 
 
 27
 However, the court in Heath also noted that "an unpaid temporary crew person may indeed qualify as an employee for Jones Act purposes...." Id. And while the defendants in Heath argued that the crew not being compensated was a determinative factor, the court found this approach to be "too parochial a view." Id. at 1468. The court went on further to state that "[w]age payment is not a sine qua non for qualification as an employee under the common law." Id. Finally, the Heath court provided the four elements that it considers in making this type of status determination: (1) the selection and engagement of the putative employee; (2) the situation vis-a-vis payment; (3) the situs of the power of dismissal; and (4) the situs of control over on-the-job conduct. Id. Of the four elements, the court regarded "payment of wages [ ] the least important." Id. See also Read v. Yacht Meridian, 224 F.Supp. 241 (S.D.Fla.1963).
 
 
 28
 The factors above were derived from the law of agency. In that context, "[c]onsideration is not necessary to create the relation of principal and agent and it is not necessary in the case of master and servant." Read at 245, citing Restatement (Second) Agency 225 at 497.
 
 
 29
 Graham was in a different position from the plaintiffs in Heath because he was at the disposal of Brazil. Not only did Brazil select Graham, and have the power to dismiss, but he also had the authority to control his on-the-job conduct. These controls weigh in favor of establishing an employment status between Graham and Brazil.
 
 
 30
 Finally, a case that involved the question of "seamen" status Complaint of Falkiner, 716 F.Supp. 895 (E.D.Va.1988) is also distinguishable. In Falkiner, the court found that volunteer cannoneers who were injured aboard a yacht during a mock pirate battle during a festival, were not seamen for Jones Act purposes. 716 F.Supp. at 903. The injured parties submitted for decision the issue of their status as seamen within the purview of the Jones Act. Id. at 901.
 
 
 31
 The Falkiner court found significant the following: that the Falkiners, who were the owners of the vessel on which the claimants were injured, did not select the claimants to participate in the mock battle; that the Falkiners did not pay the claimants' wages; that the claimants and the Falkiners were jointly participating in the event; that the Falkiners never exercised exclusive control over the claimants as cannoneers; and that the claimants were not performing a service normally provided by the crew. Id. at 902.
 
 
 32
 The Falkiner court concluded that under these circumstances, the claimants were not seamen for Jones Act purposes. Again, the compensation factor was only one of several factors that the court weighed and was by no means the sole or even the predominant consideration.
 
 
 33
 In Falkiner, the court relied heavily on the fact that the cannoneers were not "performing some type of work typically performed by the [vessel's] crew." Id. at 904. In the case at hand, Graham was at all times performing "typical" crew work, including assisting the skipper as his mate.
 
 
 34
 The duration of time aboard a vessel is not enough, standing alone, to determine status as a seaman under the Jones Act. The Supreme Court has expressly rejected what it referred to as the "voyage" test, that is that anyone working on board a vessel for the duration of a "voyage" in furtherance of the vessel's mission has the necessary employment-related connection to qualify as a seaman. Chandris, --- U.S. at ---- - ----, 115 S.Ct. at 2184-85. Instead the court has endorsed a "status-based" standard stressing that the seaman status belongs to "those maritime workers who form the ship's company." Id. at ----, 115 S.Ct. at 2186.
 
 
 35
 Thus, under the circumstances, there is a genuine issue of material fact as to whether Graham had a connection to The Ambrose that was substantial in duration and nature.
 
 Motion for Leave to Amend
 
 36
 The district court denied Graham's motion for leave to amend finding that the amendment would be futile. The proposed amendment was offered six months after the first amendment to his answer, and added the Jones Act claim. The district court found that "absent evidence that Graham was working aboard The Ambrose in a more or less permanent status in an employment-related position, he cannot maintain an action under the Jones Act." Because we find that there is a question of fact regarding Graham's seaman status that could not be decided by summary adjudication, we also find that the district court erred in denying Graham's motion to amend his answer on the ground that it was futile.
 
 
 37
 Reversed and remanded for further consideration consistent with this opinion.
 
 GOODWIN, Circuit Judge, dissenting:
 
 38
 I dissent because I do not believe Congress intended by the Jones Act to create access to insurance for catastrophic injuries suffered by hobby sailors who, from time to time, venture onto navigable waters without pay, for their own benefit, or, for the benefit of others they choose as objects of their bounty and good will.
 
 
 39
 The statute provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages at law ..." 46 U.S.C.App. § 688. The injured party must prove three facts: 1) personal injury; 2) seaman status; and 3) that the injury arose in the course of employment.
 
 
 40
 The majority discusses two discrete status requirements together: course of employment, and the occupational category of seaman, as if there were a single inquiry the jury could answer with a single yes or no. The experienced district judge looked at the statute, the more or less undisputed facts of the case, and the few appellate decisions available on the definition of "seaman" and granted summary judgment, thereby keeping the policy question in this case from going to the jury at all.
 
 
 41
 A jury is too blunt an instrument to answer a complex question of legal policy (mixed law and fact) with a simple yes or no, although it has become more or less traditional to allow jurors to do so in worker compensation and product liability cases. In such cases, appellate review tends to be reduced to an audit of the judge's instructions, and if they pass muster, almost any award the jury sees fit to make will stand immune from further review. U.S. Const. amend. VII, and cases too numerous to rehearse in a dissent. But the aura that surrounds jury verdicts which make public policy in personal injury cases is a good reason for the careful and sensitive use of summary judgment where there are no real facts for a jury to decide. This case is a perfect example, because of the horrifying injury suffered by the plaintiff, of the adage that if the case goes to the jury, the only question it will actually decide will be the number of digits to place after the dollar sign.
 
 
 42
 I do not believe that a reasonable jury can make Graham a seaman, by saying in a verdict that he was one. Nor do I believe a jury can, by saying he was working as an employee of the ship when he was injured, make him an employee. He took instructions from the master of the vessel, just as amateur team athletes take orders from a coach. These relationships are not called employment relationships, they are called sports, or hobbies, or recreation.
 
 
 43
 The term "seaman" is a term of art and is not defined by the Jones Act. The Supreme Court has said that "a seaman is a mariner of any degree, one who lives his life upon the sea." Warner v. Goltra, 293 U.S. 155, 157, 55 S.Ct. 46, 47, 79 L.Ed. 254 (1934). The Supreme Court has also held that Congress intended its language to mean what it meant at the time the Jones Act was passed in 1920. McDermott International, Inc. v. Wilander, 498 U.S. 337, 342, 111 S.Ct. 807, 810-11, 112 L.Ed.2d 866 (1991) quoting Morissette v. U.S., 342 U.S. 246, 263, 72 S.Ct. 240, 249-50, 96 L.Ed. 288 (1952).
 
 
 44
 Seaman status is a mixed question of law and fact and may be determined by summary judgment in appropriate circumstances. McDermott International, Inc. v. Wilander, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991); Papai v. Harbor Tug and Barge Co., 67 F.3d 203, 205 (9th Cir.1995). Judges prefer to send this kind of question to the jury when they can, because they are difficult questions, and appellate courts have encouraged them to be sent to juries. But lines do have to be drawn, or all serious injury cases would go to juries, and that is not the law.
 
 
 45
 The test for seaman status was recently reformulated by the Supreme Court and is correctly cited by the majority opinion. Chandris, Inc. v. Latsis, --- U.S. ----, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). The first part of the test, that to be a seaman, an employee must contribute to the function of the vessel or to the accomplishment of its mission, is not a material question in this case. The plaintiff clearly contributed to the function of the vessel.
 
 
 46
 The second part of the test requires that a seaman have a "connection to a vessel in navigation ... that is substantial in terms of both its duration and nature." Id. at ----, 115 S.Ct. at 2190. The purpose of this part of the test is to separate sea-based maritime employees from "workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." Id.
 
 
 47
 We have interpreted the Chandris test to require a fact-specific examination encompassing the totality of the injured person's employment circumstances. Papai v. Harbor Tug and Barge Company, 67 F.3d 203, 206 (9th Cir.1995). Papai is not particularly helpful in today's case because Papai does not involve a recreational-volunteer fact pattern, but rather seeks to explain how to apply Chandris to union workers, like welders and machinists who may come aboard and work for varying amounts of time on different vessels, whether they are at anchor, dockside, or under way.
 
 
 48
 Here, Graham had only a temporary, sporadic connection to The Ambrose. Without even addressing whether Graham was an employee within the meaning of the phrase "employment related connection to a vessel in navigation" under the statute, he does not appear to meet the "duration and nature" part of the seaman test. No part of his livelihood was earned at sea, although there are a few cases holding that fact not controlling.
 
 
 49
 Nothing in Wilander or Chandris or the 9th Circuit case law promotes extending to jurors the power to define recreational boaters as seaman. The earning of wages is not always necessary to be a seaman, but there is a difference between a workaway (one who works for passage), or a "shares" fisherman (who labors for a percentage of the catch), and a volunteer recreational boater. If vocational status is the key, and if the definition of seamen is further limited by the duration of one's connection to the vessel, it is unclear how the benediction of a jury can qualify this unfortunate accident victim as a seaman.
 
 
 50
 Chandris cites with approval the 5th Circuit rule that approximately 30% of the worker's time should be spent in connection with the vessel to trigger the protection of seaman status. Chandris, --- U.S. at ----, 115 S.Ct. at 2191. This figure is to serve as no more than a "guideline" Id., but guidelines should guide somewhere. The plaintiff's water-borne activities were more like those of a weekend yachtsman than those of a mariner earning his bread, maintenance and cure, and health insurance by his toil aboard ship.
 
 
 51
 One reported district court case that has come down since Chandris declined to extend seaman status to recreational boaters. Hardesty v. Rossi, 1995 WL 688416 (D.Md.). Plaintiff, aboard her friend's boat for a weekend sailing trip, failed both prongs of the Chandris test, having neither the employment-related connection to the vessel, nor the durational requirement. The court specifically found that she was a full-time employee of a land-based clinic, and her expected stay aboard the vessel was less than two days.
 
 
 52
 Another post-Chandris district court case failed to extend seaman status to a worker who did not spend 30% of his time aboard the vessel. Nix v. Sub Sea International, Inc., 1995 WL 569245 (E.D.La.) (crane operator injured when walking between a lift barge and a drilling platform did not spend 30 percent of his time aboard a vessel and was not a seaman); See also Dietrich v. U.S., 1995 WL 617577 (E.D.La.) (electrician's helper, aboard for a temporary, ten-day assignment did not have the necessary duration or type of activity required to be a seaman).
 
 
 53
 One of the few cases that has extended seaman status to recreational boaters, and relied on by the majority, is Petition of Read, 224 F.Supp. 241 (S.D.Fla.1963). The district court in this case distinguished Read by noting that the plaintiff in Read was found to have been a full crew member and subject to the control of the defendant ship owners. In re Boy Scouts of America, 875 F.Supp. 1391, 1396 citing Heath v. American Sail Training Ass'n, 644 F.Supp. 1459 (D.R.I.1986). However, both trial judges ruled in Read and in today's case without the benefit of the language of Chandris. Read is inconsistent with Chandris. "Lack of long continued attachment to the vessel does not serve to deny [Read] the status of a seaman when he is injured while assigned to and performing normal crew service." Read, 224 F.Supp. at 246.
 
 
 54
 While Chandris does not require "continued attachment" to a vessel it does require an attachment that is substantial both in its duration and nature. Read simply does not provide support for the conclusion that Graham's seaman status is a jury question. Furthermore, the district court relied on the language of Heath to distinguish Read. However, in Heath, the court presumed seaman status of the volunteer sailors and was analyzing only the "in the course of employment" requirement of the Jones Act. Heath, 644 F.Supp. at 1468.
 
 
 55
 The history of maintenance and cure, afforded by Admiralty law long before Congress enacted the Jones Act incorporating it, is inconsistent with the extension of Jones Act benefits to essentially recreational boaters. The obligation of maintenance and cure has its source in the employment relationship and the wardship of Admiralty. Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932); Gardiner v. Sea-Land Service, Inc., 786 F.2d 943 (9th Cir.1986), cert. denied 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986). Traditionally, maintenance and cure served three purposes: (1) to protect the poor and improvident seaman while ill in foreign ports, (2) to encourage ship owners to protect the seaman's safety and health while in service, and (3) to induce employment in the merchant marine. Gardiner, 786 F.2d at 946 paraphrasing Vella Ford Motor Co., 421 U.S. 1, 3-4, 95 S.Ct. 1381, 1382-83, 43 L.Ed.2d 682 (1975). For all of the above reasons, I believe the district court correctly held that Graham was not a seaman, and was not injured in the course of employment, two critical qualifications for Jones Act coverage. I would affirm.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation